UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDITH WHITTAKER,

                          Appellant,

-v.-

VERIZON BUSINESS GLOBAL LLC, as
successor to Reorganized Debtor, MCI
COMMUNICATIONS CORPORATION,

                          Appellee.

S.D.N.Y. No. 1:07-cv 3408

## INITIAL BRIEF OF APPELLANT JUDITH WHITTAKER

## ORAL ARGUMENT REQUESTED

HUGHES HUBBARD & REED LLP
Daniel S. Lubell (DL-7932)
Jeffrey S. Margolin (JM-4853)
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

Attorneys for Judith Whittaker

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

JURISDICTIONAL STATEMENT ........................................................................................3

STATEMENT OF ISSUES ..................................................................................................4

STATEMENT OF THE CASE................................................................................................4

STATEMENT OF FACTS ......................................................................................................7

    A.    Pre-Merger Funding of Whittaker Plan Account....................................................7

    B.    Post-Merger Plan Status.........................................................................................8

    C.    Acceleration of Plan Account ................................................................................9

    D.    Whittaker Maintained Her Funds in the Putnam Money Market Account
        In Reliance on the Statements by Putnam and MCI ..............................................12

STANDARD OF REVIEW ....................................................................................................13

ARGUMENT ..........................................................................................................................14

    A.    The Court Erred as a Matter of Law when It Held that a Distribution of
        Trust Assets under the Tax Code Was Not a Distribution of the Trust
        Assets for Ownership Purposes ............................................................................14

    B.    The Court Erred by Finding that the Trust Assets Were Not Distributed
        in Fact...................................................................................................................19

    C.    Verizon Should Have Been Equitably Estopped From Claiming
        Ownership of the Putnam Money Market Account ..............................................24

    D.    Solvent Verizon Should Be Directed to Pay Whittaker Her Plan Benefits ..........31

CONCLUSION........................................................................................................................33

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40 (2d Cir. 1991)...................................................28

Aramony v. United Way of Am., 254, F.3d, 403 (2d Cir. 2001)................................................30

Bank of America, N.A. v. Moglia, 330 F.3d 942 (7th Cir. 2003)................................................16

Bazak Int'l Corp. v. Tarrant Apparel Group, 378 F. Supp. 2d 377 (S.D.N.Y. 2005)...................22

Boland v. Parmelee, No. 96-CV-311 (RSP/GJD), 1997 U.S. Dist. LEXIS 16157
    (N.D.N.Y. Oct. 15, 1997)..........................................................................................32

Brass v. Am. Film Techs., Inc., 987 F.2d 142 (2d Cir. 1993) .......................................................29

In re Cajun Elec. Power Co-op Inc., 230 B.R. 715 (M.D. La. 1999) ...........................................32

Cameron & Mittleman v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159 (3d Cir. 2002) .....13, 24

Chautauqua County Sheriff's Employees Ass'n v. Chautauqua Local 807, 482 N.Y.S.2d
    690 (N.Y. Sup. Ct. 1984) ..........................................................................................15

In re Cochise College Park, Inc., 703 F.2d 1339 (9th Cir. 1983) .................................................32

Delyanis v. Dyna-Empire, Inc., 465 F. Supp. 2d 170 (E.D.N.Y. 2006) .......................................22

Demirovic v. Bldg. Serv. 32 B-J Pension Fund, 467 F.3d 208 (2d Cir. 2006)..............................24

Donovan v. Bierwirth, 680 F.2d 269 (2d Cir. 1982).............................................................27, 31

In re Ellison Assoc., 13 B.R. 661 (Bankr. S.D.N.Y. 1981) ..........................................................29

Fay v. Oxford Health Plan, 287 F.3d 96 (2d Cir. 2002) ...............................................................27

Feldman v. Capitol Piece Dye Works, Inc., 293 F.2d 889 (2d Cir. 1961)....................................22

Fellows, Read & Assoc., Inc. v. Rieder, 194 B.R. 734 (S.D.N.Y. 1996) ......................................13

In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 130 F.3d
    52 (2d Cir. 1997)........................................................................................................18

Food Holdings, Ltd. v. Bank of Am. Corp. (In re Parmalat Sec. Litig.), 477 F. Supp. 2d
    602 (S.D.N.Y. 2007)..................................................................................................22

Fragetti v. Fragetti, 262 A.D. 527 (2d Dep't 1999) .....................................................................23

ii

## Table of Authorities
(Continued)

Page(s)

Gala Enters. V. Hewlett Packard Co., 970 F. Supp. 212 (S.D.N.Y. 1997)....................................17

Havens v. Havens, 126 Misc. 155 (N.Y. Sup. Ct. 1925) ..............................................................23

Hilord Chemical Corp. v. Ricoh Elecs., Inc., 875 F.2d 32 (2d Cir. 1989) ....................................22

In the Matter of Greystone III Joint Venture, 995 F.2d 1274 (5th Cir. 1991) ..............................32

Int'l Travel Arrangers v. Frontier Airlines, Inc. (In re Frontier Airlines, Inc.), 121 B.R.
    386 (D. Colo. 1990) ...............................................................................................................13, 24

Jones v. Flowers, 574 U.S. 220 (2006) ........................................................................................27

Karaha Bodas Co. v. Pertamina, 313 F.3d 70 (2d Cir. 2002) ......................................................17

Kress v. Food Employers Labor Relations Ass'n, 391 F.3d 563 (4th Cir. 2004).........................24

Kronisch v. United States, 150 F.3d 112 (2d Cir. 1998) ..............................................................21

In re La Difference Rest., Inc., 29 B.R. 178 (Bankr. S.D.N.Y. 1983).........................................31

Leading Mfr. Pte. Ltd. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.), 313 B.R. 565
    (S.D.N.Y. 2004)............................................................................................................................14

Levine v. 860 West Tower, Inc., 96 Civ. 6124, 1999 U.S. Dist. LEXIS 4430 (S.D.N.Y.
    Mar. 31, 1999).............................................................................................................................30

LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.), 274 B.R.
    600 (Bankr. S.D.N.Y. 2002) ......................................................................................................23

Liberty Mut. Ins. Co. v. Official Unsecured Creditors' Comm. of Spaulding Composites
    Co., (In re Spaulding Composites Co., Inc.), 207 B.R. 899 (9th Cir. B.A.P. 1997)...............16

In re Macmillan Inc., No. 96 Civ. 19 (DLC), 1996 U.S. Dist. LEXIS 8315 (S.D.N.Y.
    June 13, 1996).............................................................................................................................13

In re Manhattan Investment Fund Ltd., 359 B.R. 510 (Bankr. S.D.N.Y. 2007)...........................18

Mercado v. United States Customs Serv., No. 85 CV 3758, 1986 U.S. Dist. LEXIS
    19488 (E.D.N.Y. Oct. 3 1986) ..................................................................................................17

Miller v. Heller, 915 F. Supp. 651 (S.D.N.Y. 1996)....................................................................16

N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513 (1984) ................................................................32

Nicolette v. Essenfeld, 171 N.Y.S.2d 373 (N.Y. Sup. Ct. 1958)..................................................15

iii

**Table of Authorities**
(Continued)

Page(s)

Official Comm. of Unsecured Creditors of Columbia Gas Transmission Corp. v
Columbia Gas Sys., Inc. (In re Columbia Gas Sys. Inc.), 997 F.2d 1039 (3d Cir.
1993), cert. denied, 114 S. Ct. 1051 (1994)...........................................................................16

Owens v. Owens (In re Owens), No. 03 Civ. 3408 (BSJ), 2005 U.S. Dist. LEXIS 2300
(S.D.N.Y. Feb. 17, 2005) ...............................................................................................13

Penato v. George, 52 A.D.2d 939, 383 N.Y.S.2d 900 (2d Dep't 1976) ......................................29

Perreca v. Gluck, 295 F.3d 215 (2d Cir. 2002).....................................................................27, 31

RTC v. Mackenzie, 60 F.3d 972 (2d Cir. 1995) .........................................................................16

In re Shoppers Paradise, Inc., 8 B.R. 271 (Bankr. S.D.N.Y. 1980)..............................................32

In re Shulman Transp. Enter., Inc., 744 F.2d 293 (2d Cir. 1984) ................................................23

Skeete v. McKinsey & Co., No. 91 Civ. 8093, 1993 U.S. Dist. LEXIS 9099 (S.D.N.Y.
July 7, 1993)..................................................................................................................21

Smoothline Ltd. v. N. Am. Foreign Trading Corp., No. 00 CIV. 2798 (DLC), 2003 U.S.
Dist. LEXIS 3085 (S.D.N.Y. Mar. 7, 2003) ....................................................................21

T & B Scottdale Contractors, Inc. v. United States, 866 F.2d 1372 (11th Cir. 1989),
cert. denied sub nom. Ellenberg v. T & B Scottdale Contractors, Inc., 493 U.S. 846
(1989)........................................................................................................................16, 23

Texaco Inc. v. Bd. of Comm'rs for the LaFourche Basin Levee Dist. (In re Texaco Inc.),
254 B.R. 536 (Bankr. S.D.N.Y. 2000)...............................................................................32

Torix v. Ball Corp., 862 F.2d 1428 (10th Cir. 1988)..................................................................24

Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68 (S.D.N.Y. 1991)........................................21

United States v. Nat'l Bank of Commerce, 472 U.S. 713 (1985).................................................27

United States v. One 1982 Porsche 928, 732 F. Supp. 447 (S.D.N.Y 1990)................................17

United States v. Stumpff, 604 F.2d 27 (8th Cir. 1979).................................................................17

United States v. United States Gypsum Co., 333 U.S. 364 (1948)...............................................14

In re The Warnaco Group, 03 Civ. 4201, 2006 U.S. Dist. LEXIS 4263 (S.D.N.Y. 2006)............18

iv

**Table of Authorities**
(Continued)

Page(s)

Weichman Pig Co. v.Jack-Rich, Inc. (In re Jack-Rich, Inc.), 176 B.R. 476 (Bankr. C.D. Ill. 1994)...............................................................................................................31

In re Windsor Plumbing Supply Co., 170 B.R. 503 (Bankr. E.D.N.Y. 1994)..............................29

## STATUTES AND RULES

11 U.S.C. § 541(d) ............................................................................................................15

28 U.S.C. § 158(a) ..............................................................................................................3

26 CFR 1.451-2(a) ............................................................................................................17

Fed. R. Civ. P. 11 ............................................................................................................20

Fed. R. Civ. P. 30(b)(6)...................................................................................................6, 20

## MISCELLANEOUS

Mertens Law of Federal Income Taxation § 25B.212 (1998) ......................................................16

Restatement (Second) of Contracts § 206 (1981) .........................................................................31

v

Appellant Judith Whittaker ("Whittaker"), respectfully submits her initial brief on appeal from the *Order Granting Reorganized Debtors' Objection to Proof of Claim No. 3785, Filed by Judith Whittaker,* entered on April 11, 2005 (the "Order") and the underlying O*pinion Granting the Reorganized Debtors' Objection to Proof of Claim No. 5, Filed by Judith Whittaker,* entered March 27, 2007 (the "Opinion").

## PRELIMINARY STATEMENT

This is an appeal from a Bankruptcy Court order which allows Verizon Business Global LLC ("Verizon"), as successor to the Reorganized Debtor, MCI Communications Corporation ("MCI"), to confiscate Whittaker's fully-funded Money Market account at Putnam Fiduciary Trust Company ("Putnam"). The basis for the Order is that the funds in the Money Market account were actually held in trust by Putnam as part of an MCI Deferred Compensation Plan despite the fact that MCI had accelerated payment of Whittaker's Deferred Compensation Plan benefits more than eight months prior to its bankruptcy filing. In rendering its decision, the Bankruptcy Court recognized that MCI had removed the Deferred Compensation Plan restrictions on Whittaker's receipt of the funds by making "the funds in the current account available to you whenever you choose to take them" and by identifying her Money Market account "as simply an account with Putnam." The Bankruptcy Court also acknowledged that MCI and Putnam were permitted to accelerate payment of Whittaker's benefits under the Deferred Compensation Plan as well as under the Trust Agreement established to meet MCI's Plan obligations. The Bankruptcy Court even acknowledged that the removal of restrictions to Whittaker's receipt of her Deferred Compensation Plan benefits effectuated a distribution of trust funds for purposes of federal tax law. However, the Bankruptcy Court erred when it held as a

1

matter of law (without any legal support) that the removal of the Deferred Compensation Plan restrictions and Whittaker's receipt of a distribution of trust funds for tax purposes did not vest her with ownership of the funds for property law purposes. In so holding, the Court ignored that ownership under state law is granted by setting apart an account for an individual in which she is given unqualified control over the funds therein, as well as the logic that individuals are taxed for compensation they own, not for funds owned by their employer.

The Bankruptcy Court also erred when it found no evidence that a distribution of funds from the trust had actually been made to Whittaker. The Court simply ignored, among other evidence, that (i) Whittaker's Plan account at Putnam had been fully funded with her deferred compensation; (ii) that the November 20, 2001 email from Putnam and MCI (the "Putnam Email") reflecting the acceleration of Whittaker's Deferred Compensation Plan benefits and the instructions to treat Whittaker's Plan account as her own account at Putnam, was the only business record that Putnam produced relating to Whittaker's account during the relevant time period; (iii) that MCI had admitted in writing that it had no record of a debt owing to Whittaker, reflecting MCI's payment of its Deferred Compensation Plan obligations to Whittaker; and (iv) that MCI was unable to locate any records whatsoever of David Blackman, the MCI Senior Manager with sole responsibility for the Deferred Compensation Plan's administration, who directed the acceleration of Whittaker's Plan benefits and treatment of her Plan account as her own account.

The Bankruptcy Court also erred by not properly applying the doctrine of equitable estoppel to estop Verizon, as successor to MCI, from now taking the position that Whittaker had to physically remove the funds from her account to gain ownership of such funds. This position is in direct contravention of MCI's specific written representations that the "formal Plan is no

2

longer in place", that Whittaker's account is now "viewed as simply an account with Putnam," that Whittaker could "keep your account as is" and that the funds in that "account are available to you whenever you choose to take them."  The Court failed to appreciate the context in which the Putnam Email was written – in response to Whittaker's specific request to "cash out" her account, the parties' prior dealings by email and the contemporary evidence validating the truth of the Putnam Email contents.  The Court also seemed to go out of its way to find that Whittaker had acted negligently and unreasonably by not confirming in writing what MCI and Putnam had already confirmed in writing, while excusing MCI from its legal duty to correct any purported misstatement.

Finally, in holding that Whittaker's account was still subject to the Deferred Compensation Plan and that neither the Plan nor Whittaker's Deferral Agreement were being rejected by the Reorganized Debtors, the Bankruptcy Court failed to take the next step and find that Whittaker was entitled to her Plan benefits because Verizon, as the successor to MCI, "is no longer Insolvent" for purposes of resuming payment of Plan benefits.

## JURISDICTIONAL STATEMENT

Section 158(a) of Title 28, United States Code, provides that "District Courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under Section 157 of [Title 28, U.S.C.]."  28 U.S.C. § 158(a).  The Order is a final, appealable order as it disposes of all issues concerning Whittaker's bankruptcy claim and her contentions that she has better rights to the funds in the Putnam account than MCI's successor, Verizon.

3

## STATEMENT OF ISSUES

1.     Did the Bankruptcy Court err by holding that no distribution of trust funds in Whittaker's Plan account at Putnam had been made despite the fact that in response to Whittaker's request to remove funds from the Deferred Compensation Plan, MCI, as Plan sponsor and grantor of the "rabbi" trust established at Putnam to pay Plan benefits, (as well as Putnam as Trustee), advised Whittaker in writing, consistent with MCI's rights under Section 12.07 of the Plan "to accelerate the payment of any benefits under this Plan at any time" and Putnam's rights under Section 5.4(d) of the Trust "to make payments from the Trust to such person, in such manner, at such times and in such amounts as MCI shall direct", that there is "no longer a formal plan in place," the funds in Whittaker's account "are available to you whenever you choose to take them" and that Whittaker's account would be treated henceforth "as simply an account with Putnam"?

2.     Did the Bankruptcy Court err when it found that Whittaker had not met her burden to identify documents reflecting the transfer of trust funds to Whittaker when, among other evidence, the <u>sole</u> Putnam business record relating to Whittaker's Plan account during the relevant time frame was the Putnam Email, which communicated MCI's acceleration of Whittaker's Plan benefits and the treatment of Whittaker's Plan account as her own account at Putnam, when MCI admitted in writing that it has no record of a debt owed to Whittaker and when MCI was unable to locate any records maintained by David Blackman, MCI's Senior Manager with <u>sole</u> responsibility for the Plan's administration, who directed the treatment of the Plan account as Whittaker's own account?

3.     Did the Bankruptcy Court err by not applying the doctrine of equitable estoppel to estop Verizon from confiscating Whittaker's account when the evidence demonstrated that the specific representations made by its predecessor, MCI, that "the funds in the current account are available to you whenever you choose to take them", that your account is "viewed as simply an account with Putnam," and that "you are able to keep your account as is" reasonably induced Whittaker to leave her funds in the Putnam account rather than investing them elsewhere?

4.     If the Debtors did not reject Whittaker's Deferral Agreement or the Deferred Compensation Plan, as the Court found, did the Court err by not requiring payment of Plan benefits to Whittaker since Whittaker's fully funded Plan account remained separate and intact at Putnam through MCI's emergence from bankruptcy and merger into Verizon and since MCI was therefore "no longer Insolvent" for purposes of resuming Plan payments under Sections 3.2(d), 3.3 and 4.1 of the Trust Agreement?

## STATEMENT OF THE CASE

On July 21, 2002 (the "Petition Date") and thereafter, MCI and affiliated debtors (collectively, "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Bankruptcy Court approved the Debtors'

4

Modified Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Reorganization Plan") on October 31, 2003. The Reorganization Plan became effective April 20, 2004. The Reorganized Debtors subsequently merged with Verizon Communications Inc. on January 6, 2006. Under the merger agreement, MCI merged with Eli Acquisition LLC as a wholly owned subsidiary of Verizon Communications Inc. MCI is now doing business as Verizon Business Global LLC. (Opinion at 4.)

Ms. Whittaker was not given notice of MCI's bankruptcy filing, nor that MCI had directed Putnam to freeze her Putnam Money Market account. (Fact Stip. ¶ 16.) When Whittaker went to withdraw the funds, which had been made available to her at any time eight months prior to the bankruptcy filing, she was advised by MCI's representative that the only way she could recover part of her account funds was by filing a Proof of Claim. (Id. at ¶ 17.) After she filed a Proof of Claim, Whittaker received an objection to her Proof of Claim, asserting that the Debtors had reviewed their books and records and had determined that the Debtors had "no record of a debt owed" to Judith Whittaker. (Id. at ¶¶ 18, 20 and Exh. H.) Whittaker also received (i) the Debtors' notice to reject the Deferred Compensation Plan as an executory contract (D.E.[1] 9016, 10606 and 12904); (ii) the Debtors' withdrawal of the notice of rejection (D.E. 12815 and 13315); (iii) another objection to her claim (D.E. 13070); and (iv) the Debtors' refusal to make distributions to Whittaker on account of that portion of her claim that the Debtors did not even dispute (D.E. 12359 and 12904).

On February 9, 2004, Whittaker served discovery upon the Debtors, seeking documents concerning the Deferred Compensation Plan and her account. On September 24, 2004, Whittaker again served discovery upon Debtors. Notwithstanding repeated efforts by

---

1.    D.E. stands for Bankruptcy Court Docket Entry.

Whittaker's counsel to obtain responses to her discovery requests, Whittaker did not receive a single document or response until after she moved to compel discovery.  (D.E. 12908, 14749.)

The Debtors ultimately agreed in a stipulation entered December 28, 2004 (D.E. 14749) that (i) distributions on the allowed amount of Whittaker's claim would be made, (ii) procedures for determining Whittaker's claim to ownership of her account or priority treatment of her claim would be established; and (iii) production of documents made.  Even then, the records produced by Debtors were incomplete.

When asked about the Putnam Email reflecting the acceleration and setting apart of Whittaker's account at Putnam, Raymond Helms, III ("Helms"), the Debtors' Senior Manager with accounting responsibilities for the Deferred Compensation Plan, testified: "to my knowledge, David Blackman was keeping the records and interfacing with this whole process." (Helms Depo. at 76.)  Nonetheless, the Debtors were not able to locate any records maintained by David Blackman, the Debtors' Senior Manager with sole responsibility for the Deferred Compensation Plan's day-to-day administration, relating to either the Deferred Compensation Plan or accounts maintained thereunder.  (Fact Stip. ¶¶ 10 and 21.)

The parties thereafter agreed to the Fact Stipulation (D.E. 18280).  In addition, the parties agreed that the testimony of Helms and Deborah Hutchins ("Hutchins"), the Rule 30(b)(6) representative of Putnam (including its affiliates performing services with respect to the Deferred Compensation Plan), would be presented by deposition transcripts.  (Fact Stip. Exh. I – "Helms Depo."; Exh. J – "Hutchins Depo.")  The testimony of Judith Whittaker and other evidence of her entitlement to her account were presented at a hearing held on June 20, 2006.  (See Transcript of June 20, 2006 hearing ("6/20/06 Tr.") (D.E. 18792); Exhibits 1 through 5 ("Exhs.

6

1-5") admitted into evidence at the June 20, 2006 hearing (D.E. 18817); and letter from Daniel S. Lubell, Esq. to Honorable Arthur J. Gonzalez, dated June 26, 2006 (D.E. 18398).)

More than nine months after the June 20, 2006 hearing, Judge Gonzalez issued his Opinion (D.E. 18790). On April 11, 2007, the Bankruptcy Court entered its Order (D.E. 18812), which Whittaker timely appealed. (D.E. 18801, 18813).

## STATEMENT OF FACTS

### A.    Pre-Merger Funding of Whittaker Plan Account

Judith Whittaker is a former member of the board of directors of MCI, having served from 1985 until MCI merged with WorldCom, Inc. in September 1998 (the "Merger"). (Opinion at 2; Fact Stip. ¶1.) On June 27, 1994, Whittaker executed a deferral agreement (the "Deferral Agreement"), initiating her participation in the MCI Communications Corporation Board of Directors Deferred Compensation Plan (the "Deferred Compensation Plan" or "Plan"). (Opinion at 2; Fact Stip. ¶¶2-4 and Exhs. A and B.) Whittaker elected to defer 100% of her retainer fees and meeting fees as a director and to receive her deferred compensation beginning no later than Plan Year 2003. (Id. Fact Stip. ¶5 and Exh. A.)

While the Plan stated in section 11.01 that the "Company's obligation under the Plan shall be an unfunded and unsecured promise to pay," the Company in fact funded an account for Whittaker at Putnam, where MCI had established a "rabbi" trust in connection with the Plan. (See Opinion at 2-3; Exhs. 1-2; Fact Stip. ¶¶6, 7, Exh. B at 11.01, Exh. C.) At all relevant times, the Plan account was fully funded and remained intact after MCI's emergence from bankruptcy. (Helms Depo. at 52-53, 96.)

MCI regularly transferred funds corresponding to the compensation Whittaker had elected to defer into her Plan account at Putnam and so notified Whittaker of these deposits into

7

her account. (6/20/06 Tr. at 10-11 and Exh. 1; Fact Stipulation ¶ 7.) Pursuant to her Deferral

Agreement, Whittaker had initially elected to have her deferred compensation treated as invested

50% in the Putnam Fund for Growth and Income and 50% in the Putnam Convertible Income

Growth Trust. Whittaker subsequently changed this election to 100% in the Putnam Money

Market Fund. (Opinion at 3; Fact Stip. ¶7.) Prior to the Merger, Whittaker regularly received

account statements detailing the balance and investment performance in her Plan account. (See

Opinion at 3; 6/20/06 Tr. at 11 and Exh. 2).

**B.      Post-Merger Plan Status**

After the Merger, the Board of Directors was reconstituted and WorldCom elected not to

extend the Plan to the new WorldCom board. (Fact Stip. ¶8.) Accordingly, after September

1988, there were no new participants in the Plan, no further contributions were made under the

Plan and the only remaining activity was tracking of pre-Merger funds invested at Putnam. (See

Opinion at 3; Helms Depo. at 22, 26, 64 - 67, 77.) There was also no nominating committee or

oversight committee at WorldCom who administered the Plan after the Merger. (Helms Depo. at

23-24.)

As of November 2001, all Plan participants had received payment of their entire Plan

accounts, except one MCI director in addition to Whittaker, who remained a director of

WorldCom and whose account is not at issue. (Fact Stip. ¶9.) [2] Although it was a requirement of

the Plan to "provide each participant with quarterly statements for his/her Deferral Account"

(Fact Stip. Exh. B at § 5.02), Whittaker stopped receiving regular account statements after the

Merger. (See Opinion at 3; 6/20/06 Tr. at 6, 12-14, 16 and Exhs. 3 and 4.) Despite several calls

---

2.    This other Plan participant never requested a cash out of her account pre-bankruptcy. (Hutchin's Depo. at 114).
      Whittaker was informed that this other participant relinquished any claims she may have had in connection with
      the WorldCom directors' settlements. Accordingly, Whittaker is effectively the only person with an interest in
      the funds held at Putnam.

to WorldCom and Putnam, she had not received statements for more than six months by November 2001.  (Id.)

On November 13, 2001, frustrated by the lack of information, Whittaker contacted Hutchins at Putnam to whom she had been referred by Helms, the WorldCom senior manager with accounting responsibilities for the Plan.  (Opinion at 3; 6/20/06 Tr. at 12-14; Fact Stip. ¶¶10-11.)  Whittaker testified that she spoke to Hutchins about her problems getting statements and asked whether she could get her money out of the account.  (6/20/06 Tr. at 14-16 and Exh. 4.)

While the Opinion states that Whittaker contacted Putnam "regarding the status of the Trust," suggesting she wanted to keep her account in its current status under the Plan (Opinion at 3), Whittaker testified that her expressed concern was the opposite:  whether she could "cash out."  (6/20/06 Tr. at 14-16.)  That fact is borne out by Whittaker's concurrent notes of the conversation.  (Exh. 4 (Hutchins said "she will check into whether I can cash out").)  And more, by Hutchins' e-mailed response which deals first with Whittaker's missing statements and then states, "as far as removing the funds from this account, I have followed up on that as well." (Fact Stip. Exh. D.)  As Whittaker testified, Hutchins also said in their initial conversation that if Whittaker received her Plan funds, she could still invest her money in a "regular" Putnam Money Market Account.  (6/20/06 Tr. at 15-16.)

**C.    Acceleration of Plan Account**

In response to Whittaker's request about "cashing out," Hutchins called David Blackman ("Blackman"), who was the WorldCom Senior Manager with sole responsibilities for the administration of the Plan at the time.  (See Opinion at 3; Fact Stip. ¶¶ 10-11; Helms Depo. 17 - 18, 49, 63.)  Blackman provided MCI's response to Whittaker's "cash out" request, which was

9

conveyed verbatim by Hutchins to Whittaker in the Putnam Email (Opinion at 3; Fact Stip. ¶ 10,

12 and Exh. D; Hutchins Depo. at 68, 85-87):

> <u>As far as removing the funds from this account</u>, I have followed up on that as well.  I spoke with a representative from MCI that had the original documentation from when you began in the plan.  Back then, there were stipulations that stated that you would keep the funds in the account until 2003, just as you had remembered.
>
> However, since there haven't been contributions going into the plan for a number of years, and therefore there is no longer a formal plan in place, <u>this is viewed as simply an account with Putnam</u>.  What this means is that the <u>funds in the current account are available to you whenever you choose to take them</u>.  That waiting period no longer exists."
>
> Hutchins further explained:  "In order to close out <u>your account</u>, and receive a check, we will need a letter of instruction from you.  That letter should be signed, and notarized.
>
> As we also discussed, you are able to keep <u>your account</u> as-is.

(Fact Stip Exh. D (emphasis added).)

This Email to Whittaker was also sent to Helms, the WorldCom Senior Manager with

accounting responsibilities for the Plan.  (Fact Stip. ¶ 10, 12.)  Helms testified that he read this

email when he received it (Helms Depo. at 72), that his understanding was that Whittaker's

current account is "available for her to take it whenever she chooses to do so" "without

qualification" (<u>id</u>. at 78-79) and that he believed "there was some authority there" for

Blackman's statements (<u>id</u>. at 80).  Helms testified that besides Bernie Ebbers, Blackman was the

only person with authority for the Plan's administration in November 2001 (<u>id</u>. at 24); that he

assumed Blackman was authorized to provide the directions contained in the Putnam Email (<u>id</u>.

at 80); and admitted that after he had read it, he said nothing to contradict MCI's stated position

as to the Plan and acceleration of Whittaker's account balance.  (<u>Id</u>.)  Helms, who is a benefits

plan accountant, also acknowledged that acceleration would make the Plan benefits property of the beneficiary.  (Id. at 7, 9, 88.)

Helms further acknowledged that MCI did not retain Blackman's files following his departure.  (Id. at 63-64.)  The Debtors have stipulated that they are unable to locate any records maintained by Blackman relating to the Plan or accounts thereunder.  (Fact Stip. ¶ 21.)  Indeed, about the only record produced by both MCI and Putnam that was contemporaneous with the November 2001 Putnam Email was the Email itself, reflecting that both MCI and Putnam had kept a business record of the acceleration of Whittaker's account.  In addition, after Debtors stated that they had "reviewed their books and records" concerning Whittaker's account, they took the position, consistent with their failure to notify Whittaker of their bankruptcy filing, that they had "no record of a debt owed" to Whittaker, reflecting again that an accelerated payment had occurred.  (Id. at ¶¶ 16, 20 and Exh. H.)

Hutchins believed that Blackman had authority from MCI for the directions given regarding Whittaker's account (Hutchins Depo. at 33, 47, 71, 83); she did not believe anything was untrue about Blackman's statements and provided his directions without qualification.  (Id. at 74-75, 83.)  Hutchins also did not believe or have reason to believe that MCI was insolvent or having financial difficulties at the time Blackman provided his instructions granting Whittaker unqualified control over her Putnam account.  (Id. at 72.)  Hutchins was justified in relying on MCI's instructions under section 5.4(d) of the Trust Agreement.

After Hutchins conveyed MCI's directions to Whittaker and Helms, she apparently took no formal action to change the title of Whittaker's account as the Plan was not her responsibility (Id. at 18-20, 67).  However, Hutchins retained the Putnam Email as part of Putnam's records concerning the treatment of Whittaker's Plan account.  Indeed, the Putnam Email is the only

11

record produced by Putnam with respect to Whittaker's account between April 10, 1995 and

MCI's bankruptcy filing on July 22, 2002 in response to two subpoenas issued by Whittaker.

(Hutchins Depo. at 13-14 and Exhs. A-C.)

### D.    Whittaker Maintained Her Funds in the Putnam Money Market Account In Reliance on the Statements by Putnam and MCI

Blackman's instructions were understood by Whittaker (as well as Helms and Hutchins)

as giving Whittaker dominion and control over her account by giving her access to withdraw

funds whenever she wanted.  (6/20/06 Tr. at 18-20; Helms Depo. at 79, 93; Hutchins Depo. at

73).  It also conformed with Whittaker's prior discussion with Hutchins about keeping her

account "as is" and holding the funds in a "regular" Putnam Money Market Fund.  (6/20/06 Tr.

at 15-16.)  In reliance upon this writing, Whittaker chose to maintain her funds in the Putnam

Money Market Fund which was "viewed as simply an account with Putnam."  (Id.)

Whittaker acknowledges that she did not declare the value of her account as income on

any tax return in 2002.  As Whittaker testified, her failure to make such a declaration in April

2002 concerning the instructions received seven months earlier in November 2001 that the funds

in her Putnam account were immediately available, was inadvertent.  (6/20/06 Tr. at 21, 35-36;

Fact Stip. ¶ 15.)  In preparing her taxes, Whittaker checked the 1099's and tax statements she had

been sent, which did not include a tax reporting form from MCI, as well as her prior years' tax

return, which also did not reflect income from this source, and she had no record of any cash

received from the account.  (Id.)

Finally, contrary to the Court's finding that Whittaker contacted Putnam in November

2002 "to request a distribution of the Trust funds" (Opinion at 3), the testimony and Fact

Stipulation are clear.  Whittaker contacted Hutchins in November 2002 requesting directions as

to where to send her letter of instructions to "get[ ] a check in the amount of the balance in her

12

account at Putnam." (Fact Stip. ¶ 17; 6/20/06 Tr. at 21-23.) While this request was made four months after Debtor's bankruptcy filing, Whittaker reasonably believed that her account was her own. She had not been informed by either Blackman, Helms or Hutchins otherwise. (6/30/06 Tr. at 23-24; Hutchins Depo. at 97-98; Helms Depo. at 80.) When she was told by Hutchins that her account had been frozen at the direction of MCI, she contacted MCI demanding a return of her funds, which MCI refused to release. (6/23/06 Tr. at 27-28; see also Fact Stip. Exh. 6.)

Eventually, Whittaker and MCI agreed by Stipulation and Order that Whittaker would be paid a partial distribution under the Reorganization Plan on the amount held in her Putnam Money Market account as of the Petition Date ($345,183) and that the parties would "proceed to judicial determination by final nonappealable order" with respect to her contentions that she has or had ownership rights in the Putnam account funds or, alternatively, that she continues to have rights to payment under the Deferred Compensation Plan. (Exh. 5 at ¶ 3.) If her claim is granted, Whittaker also claims a right to prejudgment interest. (See D.E. 18398 (illustrating computation of Whittaker's claim, less Reorganization Plan distributions received, together with prejudgment interest thereon).)

## **STANDARD OF REVIEW**

The Bankruptcy Court's conclusions of law, as well as its determinations of whether particular conduct satisfies a legal standard, are both reviewed de novo. Owens v. Owens (In re Owens), No. 03 Civ. 3408 (BSJ), 2005 U.S. Dist. LEXIS 2300, *5 (S.D.N.Y. Feb. 17, 2005); In re Macmillan Inc., No. 96 Civ. 19 (DLC), 1996 U.S. Dist. LEXIS 8315, *8 (S.D.N.Y. June 13, 1996); Fellows, Read & Assoc., Inc. v. Rieder, 194 B.R. 734, 736 (S.D.N.Y. 1996) (Cote J.); Cameron & Mittleman v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 164 (3d Cir. 2002) (issue of estoppel reviewed de novo); Int'l Travel Arrangers v. Frontier Airlines, Inc. (In re

13

Frontier Airlines, Inc.), 121 B.R. 386 (D. Colo. 1990) (promissory estoppel claim reviewed de novo).

The Bankruptcy Court's findings of fact are reviewed under a clearly erroneous standard. Leading Mfr. Pte. Ltd. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.), 313 B.R. 565, 570 (S.D.N.Y. 2004).  The Supreme Court has recognized that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

## ARGUMENT

**A.    The Court Erred as a Matter of Law when It Held that
a Distribution of Trust Assets under the Tax Code Was
Not a Distribution of the Trust Assets for Ownership Purposes.**

The Bankruptcy Court erred when it characterized the parties' dispute as concerning "the ownership of funds held by [Putnam] in a 'rabbi' trust established by [MCI]."  (Opinion at 2.) That characterization answers the Bankruptcy Court's own question, as no one disputes that assets held in a "rabbi" trust remain property of the employer subject to the claims of the employer's creditors.  The dispute in this case is whether, having accelerated payment of Whittaker's Plan benefits by making the funds in Whittaker's fully-funded Deferred Compensation Plan account immediately available to her without restriction and having set apart her account as "simply an account with Putnam" eight months prior to MCI's bankruptcy filing, MCI had distributed such funds so as to make them Whittaker's property.

In addressing this issue, the Bankruptcy Court acknowledged that MCI had the "right to accelerate the payment of any benefits under the Plan at any time without consent of the Participant . . . ."  (Opinion at 7; Fact Stip., Exh. B. § 12.04, 12.07 at 13, 14.)  It also noted that

Putnam was authorized under the Trust Agreement "to make payment from the Trust to such person, in such matter, at such times and in such amounts as MCI shall direct . . .." (Opinion at 8; Fact Stip. Exh. C at § 5.4(d) at 5.) Nonetheless, while acknowledging the right to accelerate payment of Plan benefits, and the consequent constructive receipt of benefits for tax purposes when restrictions to receipt of payment had been removed through acceleration (Opinion at 8-9), the Court held without any legal support that "it is simply incorrect as a matter of law and as a matter of logic to suggest that constructive receipt for tax purposes necessarily presupposes or results in actual ownership or possession for state property law purposes." (Id. at 9.) In so holding, the Bankruptcy Court failed to appreciate Whittaker's equitable interest in the accelerated payment of her deferred compensation and that constructive possession of the funds held in the Putnam Money Market account is a state law concept as well.

Under state law and Bankruptcy Code Section 541(d), the equitable interest in funds held in trust for an employee are considered the employee's property. See 11 U.S.C. § 541(d) ("Property in which the debtor, as of the commencement of the case, holds only legal title and not an equitable interest . . . becomes property of the estate only to the extent of debtor's legal title to such property, but not to the extent of any equitable interest in such property that debtor does not hold"); Nicolette v. Essenfeld, 171 N.Y.S.2d 373 (N.Y. Sup. Ct. 1958) (employee owns equitable interest in contributions made to welfare fund); Chautauqua County Sheriff's Employees Ass'n v. Chautauqua Local 807, 482 N.Y.S.2d 690, 692 (N.Y. Sup. Ct. 1984) ("[W]here a reserve is accumulated in a sick leave bank, just as in a welfare fund or a trust or an

employee benefit fund, whatever called, equity requires that such reserves be enjoyed by the employee on whose behalf the reserve was accumulated.").[3]

The only reason that compensation paid into a "rabbi" trust to fund deferred compensation benefits is not considered the employee's property is that federal tax law allows such funds to be treated as though they were still owned by the employer.  Thus, the law of rabbi trusts is that funds subject to a deferred compensation plan are considered the property of the company, rather than the employee, where there has not been an act of distribution of that compensation under the tax code.  RTC v. Mackenzie, 60 F.3d 972, 977 (2d Cir. 1995) ("[U]nder the tax code, it is the act of distribution which conveys the assets held in a grantor trust from the grantor to the grantee.") (citing Mertens Law of Federal Income Taxation § 25B.212 (1998)).  The key factor for retaining ownership of the funds in the Company, as Judge Posner explained in Bank of America, N.A. v. Moglia, 330 F.3d 942 (7th Cir. 2003), is keeping the executive's right to receive money from the account "subject to substantial limitations or restrictions."  Id. at 944.  If the executive's account is "his to draw on at any time (making it income to him in a practical sense), the executive must include any contribution to the trust and any interest or other earnings of the trust in his gross income in the year in which the contribution was made or the interest obtained," thus making the executive's account his own property.  Id.; see also Miller v. Heller, 915 F. Supp. 651, 661 (S.D.N.Y. 1996) ("Under the regulations, income is constructively

---

3.   See also Official Comm. of Unsecured Creditors of Columbia Gas Transmission Corp. v Columbia Gas Sys., Inc. (In re Columbia Gas Sys. Inc.), 997 F.2d 1039, 1059 (3d Cir. 1993), cert. denied, 114 S. Ct. 1051 (1994) (where the debtor's interest in property is limited to that of a trustee, no other interest (specifically, the beneficiary's equitable interest) in that property becomes part of the estate); T & B Scottdale Contractors, Inc. v. United States, 866 F.2d 1372, 1376 (11th Cir. 1989) (funds held in trust for materialmen did not belong to bankruptcy estate even though held in an account bearing debtor's name), cert. denied sub nom. Ellenberg v. T & B Scottdale Contractors, Inc., 493 U.S. 846 (1989); Liberty Mut. Ins. Co. v. Official Unsecured Creditors' Comm. of Spaulding Composites Co., (In re Spaulding Composites Co., Inc.), 207 B.R. 899, 906 (9th Cir. B.A.P. 1997) ("[A] debtor's interest in a portion of property does not subject the entire property to §541.  Nor does a claim to property mean that the entire property is part of the bankruptcy estate." Debtor's insurance policies were not the property of the estate (citation omitted)).

received in the taxable year during which it is credited to the taxpayers account, or set apart or otherwise made available to the taxpayer so that he or she may draw upon it at any time") (emphasis added); Constructive Receipt of Income, 26 CFR 1.451-2(a) ("[I]ncome although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him or otherwise made available so that he may draw upon it any time, or could do so upon giving notice." (emphasis added).)

An employee's right of unqualified control over funds is not only the touchstone of a distribution from a "rabbi" trust for purposes of federal tax law, as the Bankruptcy Court acknowledged (Opinion at 9-10), but it is also the touchstone for determining ownership and possession for purposes of state property law and under the Bankruptcy Code. See Karaha Bodas Co. v. Pertamina, 313 F.3d 70, 86 (2d Cir. 2002) (under New York law, presumption of ownership of funds by actual possession is rebutted by parties' intent or evidence of dominion and control over funds); Gala Enters. V. Hewlett Packard Co., 970 F. Supp. 212, 217 (S.D.N.Y. 1997) ("[U]nder New York law, a defendant has an 'interest' in the funds if 'any part of [the funds are] within the present or future control of the defendant.'"); United States v. One 1982 Porsche 928, 732 F. Supp. 447, 451 (S.D.N.Y 1990) ("The possession of bare legal title to the res may be insufficient to establish ownership absent other evidence of control or dominion over the property"); United States v. Stumpff, 604 F.2d 27, 28  (8th Cir. 1979) ("[O]wnership may be defined as having a possessory interest in the res, with its attendant characteristics of dominion and control; (cited in Mercado v. United States Customs Serv., No. 85 CV 3758, 1986 U.S. Dist.

17

LEXIS 19488, *3 (E.D.N.Y. Oct. 3 1986) ("dominion and control" over money necessary to establish ownership interest).[4]

This Court should find as a matter of law that by making the "funds in the current account available to you whenever you choose to take them" and by setting apart Whittaker's fully-funded Money Market account "as simply an account with Putnam," MCI both made a distribution of "rabbi" trust funds under the tax law, and also made a distribution of such funds under state property law by giving Whittaker dominion and control over these funds.  Such distributions were co-terminus.  This is not illogical as the Bankruptcy Court suggests (Opinion at 9), but makes perfect sense as employees are not taxed for property that is still owned by their employers.  Conversely, employers should not be taxed when they have accelerated the payment of Plan benefits in an account to an employee, even if that employee has not taken actual possession of the funds set apart for the employee whenever the employee chooses to take them.

The factual predicate for such a distribution was established by Whittaker.  Her deferred meeting fees and retainers had been directly deposited into her Deferred Compensation Plan account at Putnam and that account was fully funded as of November 2001.  (6/20/06 Tr. at 10-11, Exhs. 1 and 2; Fact Stip. ¶¶ 7, 14; Helms Depo. at 52-53.)  In direct response to her request to "cash out," MCI and Putnam made the funds in her "current account" available to her "whenever you choose to take them" and further stated that the "waiting period [under the Deferral Agreement] no longer exists."  (Fact Stip. Exh. D.)  While Whittaker's account had previously been subject to restrictions under the Deferral Agreement, "just as [Whittaker] had remembered"

---

4.    See also In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 130 F.3d 52 (2d Cir. 1997) (adopting "dominion and control" test to determine transferee within the meaning of § 550(a)(1)); In re The Warnaco Group, 03 Civ. 4201, 2006 U.S. Dist. LEXIS 4263, at * 18 (S.D.N.Y. 2006) ("[T]he minimum requirement of status as a 'transferee' is dominion over the money or asset [and] the right to put the money to one's own purposes"); In re Manhattan Investment Fund Ltd., 359 B.R. 510, 518 (Bankr. S.D.N.Y. 2007) ("[C]ourts have used a 'dominion and control' test to determine if an entity is an initial transferee from which an avoided transfer may be recovered under section 550(a)(1).")

(id.), the Plan gave the Company "the right to accelerate the payment of any benefits payable under this Plan at anytime" and Hutchins conveyed MCI's acceleration and treatment of her account "as simply an account with Putnam" on November 20, 2001.  (Fact Stip. Exh. B at § 12.07 and Exh. D.)  MCI concedes that Blackman's November 20, 2001 response was "MCI's response" (Fact Stip. ¶ 12) as it must since Blackman was the sole person responsible for the administration of the Plan.  (Id. ¶¶ 10, 12.)

Indeed, even the Bankruptcy Court conceded that the language of the Putnam Email "may be read to suggest that the Trust Assets had been distributed e.g. '[T]his is viewed simply as an account with Putnam,' 'What this means is that the funds in the current account are available to you whenever you choose to take them . . . In order to close out your account . . ." (Opinion at 10.)  Had the Court applied the proper standard for distributions from a "rabbi" trust, there should have been no dispute that Whittaker had received an accelerated payment of her Plan benefits in an account designated as her own account prior to MCI's bankruptcy filing, and that the funds held in that account were under her dominion and control so as to be considered Whittaker's property under state law.  Instead, the Court created its own law that funds available to Whittaker at any time in an account identified as Whittaker's own account at Putnam remained Trust Assets after acceleration of payment.  This ruling should be reversed.

**B.    The Court Erred by Finding that the Trust
Assets Were Not Distributed in Fact**

Even accepting the Court's interpretation that the legal effect of accelerating Plan payments and distributions from a rabbi trust under the tax code did not in itself result in Whittaker's possession or ownership of the funds, the Court was incorrect both as to the lack of any documents reflecting the transfer of ownership and the burden upon Whittaker of establishing that the Trust Assets were distributed in fact.

19

Far from "not identifying any documents recording such a transfer," as the Bankruptcy Court mistakenly contended (Opinion at 10), Whittaker identified the following evidence reflecting the change of ownership of the Money Market account from a Plan account to her own account:

- The Putnam Email as the <u>only</u> business record produced by Putnam regarding Whittaker's account between April 10, 1995 and MCI's bankruptcy filing on July 22, 2002 in response to two subpoenas and document requests served upon both Hutchins and Putnam under Rule 30(b)(6).

- The Putnam Email as one of only a handful of business records produced by MCI during this same period in response to subpoenas, document requests and a motion to compel.

- The acknowledgement of receipt of such Email by Helms, MCI's Senior Manager with accounting responsibilities for the Plan; his understanding that Whittaker's "current account" is "available to her to take it whenever she chooses to do so" without qualification and belief that the Putnam Email was authorized by MCI. (Fact Stip. ¶10,12; Helms Depo. at 78-80.)

- MCI's written admission under Rule 11 standards that they had reviewed "their books and records and determined that there is no record of a debt owed" to Whittaker, reflecting that her Plan benefits had in fact been accelerated and paid. (Fact Stip. ¶ 20, Exh. H at 4.)

- The numerous MCI and Putnam records introduced by Whittaker demonstrating that her compensation as a director was actually paid into her own deferred compensation account at Putnam so as to be available to her after acceleration "as simply an account with Putnam" with the funds therein "available to you whenever you choose to take them." (Exhs. 1 and 2; <u>see also</u> Helms Depo. at 52-53, 96 (Whittaker's account was, and continued to be, fully funded and intact at all relevant times.))

- Whittaker's contemporaneous notes of her discussions with Hutchins that "she will check into whether I can cash out," and Putnam and MCI's affirmative response in the Putnam Email that "as far as removing funds from the account" there is no need to do so since the account is "viewed as simply an account with Putnam." (Exh. 4; Fact Stip. Exh. D.)

- Evidence of full pay outs of all Plan participants as of December 31, 2001, except one other participant whose account balance decreased by almost $300,000 during the prior year, suggesting that restrictions were removed on all plan accounts. (Hutchins Depo. at 61-62; Helms Depo. at 68-69.)

- Evidence that MCI stopped sending quarterly statements required by the Plan (6/20/06 Tr. at 6-7, 12-14, 16), suggesting that there was in fact no formal plan in place.

In view of this specific evidence that Whittaker's "cash out" request was honored; that MCI's debt to Whittaker was satisfied; that the Putnam Email was maintained as a "business record" reflecting the parties' intent and instructions that Whittaker's identifiable and fully-funded account be treated as her own account at Putnam; that other Plan participants had been permitted to cash out and that the Plan had ceased, was certainly sufficient to establish that a distribution had in fact taken place. Indeed, in the context of Helm's testimony that "David Blackman was keeping the records and interfacing with this whole process" (Helms Depo. at 76) and MCI's admission, after Whittaker moved to compel production of documents, that it did not retain Blackman's records (Fact Stip. ¶ 21), Whittaker cannot be charged with the burden of producing such critical records but instead must be afforded the inference that Blackman's records were consistent with his instructions in the Putnam Email. See Kronisch v. United States, 150 F.3d 112, 127 (2d Cir. 1998) ("[A]n adverse inference should serve the function, insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."); Skeete v. McKinsey & Co., No. 91 Civ. 8093, 1993 U.S. Dist. LEXIS 9099, at * 14-15 (S.D.N.Y. July 7, 1993) (it may be inferred from the loss and destruction of evidence that the evidence would have been damaging to the party's case).[5]

---

5. Accord Smoothline Ltd. v. N. Am. Foreign Trading Corp., No. 00 CIV. 2798 (DLC), 2003 U.S. Dist. LEXIS 3085, *18 (S.D.N.Y. Mar. 7, 2003) ("Having properly determined that UAL failed to produce critical evidence that it was required to produce in discovery, it was appropriate to draw an adverse inference against UAL regarding what those documents would show."); Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 75 (S.D.N.Y. 1991) ([A]n adverse inference "should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the inference. It makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently. The adverse inference provides the necessary mechanism for restoring the evidentiary balance. The inference is adverse to

21

The admission that MCI did not retain any records of David Blackman, the sole MCI representative responsible for the Deferred Compensation Plan's administration and the MCI representative who both had the authority and exercised that authority to accelerate Whittaker's Plan benefits, also demonstrates both that "there [was] no longer a formal plan in place" and that any remaining records which MCI may have maintained were in fact incomplete and mistaken. Indeed Helms conceded that this may be the case as he had to "resurrect" MCI's records after the bankruptcy without Blackman's files. (Helms Depo. at 92-94.)

The impact of the Putnam Email is not diminished by the fact that Hutchins did not administratively change Whittaker's account title to be consistent with the Putnam Email because, as she testified, the Deferred Compensation Plan was not her responsibility. (Hutchins Depo. at 18-20.) See Bazak Int'l Corp. v. Tarrant Apparel Group, 378 F. Supp. 2d 377, 384 (S.D.N.Y. 2005) ("An e-mail suffices as much as a letter, a telegram or a fax to provide such objective indication of an existing agreement."); Hilord Chemical Corp. v. Ricoh Elecs., Inc., 875 F.2d 32, 37 (2d Cir. 1989) ("There are no rigid requirements as to the form or content of a confirmatory writing.").[6]

Moreover, courts have consistently found that the form or title on an account will not take precedence over the substantive instructions or parties' intentions concerning such account. See Feldman v. Capitol Piece Dye Works, Inc., 293 F.2d 889, 891 (2d Cir. 1961) (change of account name did not result in transfer of title of account funds to new account holder because "the transaction was one of form rather than substance"); Havens v. Havens, 126 Misc. 155, 158-59

---

the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss.").

6. Accord Food Holdings, Ltd. v. Bank of Am. Corp. (In re Parmalat Sec. Litig.), 477 F. Supp. 2d 602, 611 (S.D.N.Y. 2007) (an email is a direct communication sufficient to support an inference of justifiable reliance); Delyanis v. Dyna-Empire, Inc., 465 F. Supp. 2d 170, 176 (E.D.N.Y. 2006) (email acceptance is sufficient to bind party).

NY 1150643_3.DOC

(N.Y. Sup. Ct. 1925) (ownership of account funds determined by the "intent of the depositor" and "such intent was not to be determined from the form of the deposit alone," as "courts will be controlled by the substance of a transaction rather than by the name given to it"); Fragetti v. Fragetti, 262 A.D. 527, 527-28 (2d Dep't 1999) (intent of party controls over title of bank account); T & B Scottsdale Contractors, 866 F.2d at 1376 (funds in the debtor's bank account were not deemed part of the bankruptcy estate where intent was clear that they were held on behalf of third party).[7]

Finally, the Court's comment in reference to the Plan's "cash distribution" provision that "it is not clear that the distribution would have been valid even if Putnam had moved the Trust Assets between accounts or designated Whittaker the owner, rather than the beneficiary, of the Trust," is not compelling.  (Opinion at 11.)  First, the distribution reflected in the Putnam Email is a cash distribution consistent with Sections 6.03, 12.04 and 12.07 of the Plan (Fact Stip. Exh. B) as MCI accelerated payment in cash of the amount standing credited to, and in this case actually funded in Whittaker's Money Market account.  Second, Putnam was clearly authorized to make distributions in the form of a cash-funded Money Market account as the Trust Agreement authorized Putnam to make payments "in such manner, at such times and in such amounts as MCI shall direct."  (Exh. C at § 5.4(d) at 5.)  Finally, the cash distribution provision cited by the Court is a beneficiary protective provision.  MCI should not be heard to complain that it was not authorized to transfer ownership of Whittaker's fully-funded Plan account to Whittaker when Whittaker accepted such transfer as her own account.  See Torix v. Ball Corp., 862 F.2d 1428, 1429-30 (10th Cir. 1988) ("Congress wanted to assure that those who participate

---

7.   See generally In re Shulman Transp. Enter., Inc., 744 F.2d 293, 295 (2d Cir. 1984) ("Where the relative rights of a bankrupt's creditors are at issue, it is particularly important that substance not give way to form."); LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.), 274 B.R. 600, 616 (Bankr. S.D.N.Y. 2002) ("[S]ubstance [must] not give way to form in interpreting contractual relationships in bankruptcy.")

in the plans actually receive the benefits they are entitled to and do not lose these as a result of unduly restrictive provisions . . . ." (followed by Demirovic v. Bldg. Serv. 32 B-J Pension Fund, 467 F.3d 208, 214 (2d Cir. 2006))); Kress v. Food Employers Labor Relations Ass'n, 391 F.3d 563, 569-70 (4th Cir. 2004).

## C.    Verizon Should Have Been Equitably Estopped From Claiming Ownership of the Putnam Money Market Account

The Bankruptcy Court correctly stated the law of equitable estoppel but misapplied it to MCI's directions to Whittaker concerning "removing funds from the [Plan] account" in response to Whittaker's "cash out" request.  This Court reviews the application of equitable estoppel de novo.  Cameron & Mittleman v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 164 (3d Cir. 2002) (issue of estoppel reviewed de novo); Int'l Travel Arrangers v. Frontier Airlines, Inc. (In re Frontier Airlines, Inc.), 121 B.R. 386 (D. Colo. 1990) (promissory estoppel claim reviewed de novo).

First, the Bankruptcy Court stated that Whittaker failed to "identify how the Putnam Email directly represented that she owned the Trust Assets."  (Opinion at 13.)  Whittaker submits that in the context of the Email's response to her "cash out" request, the Email's several references to "your account" and Whittaker's unqualified dominion and control over same may only be fairly interpreted as a representation that Whittaker owned the funds in her account:

> "[T]here is no longer a formal plan in place, this [account] is viewed as simply an account with Putnam.  What this means is that the funds in the current account are available to you whenever you choose to take them.  That the waiting period (under your Deferral Agreement] no longer exists."  (Exh. D.)

Whittaker's estoppel argument is that if she had to remove such funds from her account to have all attributes of dominion and control over her account funds, then she was specifically mislead by the statements of Putnam and MCI that she could "keep your account as is," as

24

"simply an account with Putnam" and still have access to the funds "whenever you choose to take them" (notwithstanding Insolvency or any other event affecting MCI).

Second, notwithstanding Whittaker's uncontroverted testimony that she relied upon the Putnam Email in leaving her funds in the Putnam Money Market account (6/20/06 Tr. at 18-20), the Bankruptcy Court found that Whittaker did not rely upon the Putnam Email because she did not take "any affirmative action" in reliance upon the Email and her "failure to withdraw the Trust Assets may have equally followed from a belief that she did not own the Trust Assets." (Opinion at 13.)  In so holding, the Court overlooked first, as reflected in both Whittaker's contemporary notes and the Putnam Email, that MCI was responding to Whittakers' request to "cash out" and "remove her funds."  (Exh. 4 and Fact Stip. Exh. D.)  The presumption must be that in making this request, Whittaker would have removed Trust Assets (or why else would she have been asking to do so), but did not do so because she was told she could keep "your account as is" and have it treated "simply as an account with Putnam" with the "funds in the current account available whenever you choose to take them."  (Fact Stip. Exh. D.)  Thus, the reliance induced was by its nature passive – to lead Whittaker to believe that she could simply leave her funds in the account rather than affirmatively removing the funds to gain ownership.

Moreover, the Bankruptcy Court overlooked that Whittaker, without having received notification of MCI's bankruptcy filing or the freeze on her account, had in fact affirmatively asked where she needed to send the "letter of instruction" referred to in the Putnam Email to remove her funds.  (Fact Stip. at ¶¶ 16, 17 and Exh. D; 6/20/06 Tr. at 21-23.)  Once again the inference from this request is that Whittaker reasonably believed that the funds in the account were available whenever she chose to take them, as the Email clearly states.

25

Finally, Whittaker's reasonable belief, based on the Putnam Email, that she did not have to remove her funds to gain access, is corroborated by Whittaker's subsequent conversations with Hutchins in which, after finding out about the freeze, "[s]he started quoting an email from a couple of years ago, which both of us were on, that said that her account was treated as a regular investing account . . ."  (Fact Stip., Exh. G.)  As Hutchins' email to Helms (Exh. G) reflects, Whittaker had specifically recalled and relied upon the Putnam Email.  Having induced Whittaker not to remove her funds by its specific written representations, it was error to allow Verizon, as successor to MCI, to confiscate her funds, particularly, as discussed below, when MCI was the party with the duty to affirmatively speak up to correct any purported ambiguity or error in the Putnam Email.

While Whittaker's detrimental reliance would have been increased beyond the loss of her deferred compensation had she remembered to pay taxes on the funds in the Putnam account, her failure to do so seven months after receipt of the Putnam Email does not change the contemporary evidence corroborating her stated reliance on the Putnam Email as the reason she kept the funds in the account:

> Q.    But you did, in fact, think that the status of your account had changed in the previous year, didn't you?
>
> A.    Oh, I did.  But I had nothing to trigger it when I went to file the return.  I didn't have any cash receipts.  I didn't have any 1099.  I had no checks written on the account.  We had never reported it before, so I just didn't think of it.
>
> Q.    Did you consider $340,000 a lot of money.
>
> A.    I considered it a whole lot of money.
>
> Q.    But you didn't pay any taxes on it in 2002; right?
>
> A.    I didn't think of it, and I am glad I didn't, because I would be in one big mess now if I had paid it; and then the following year they told me the money was not mine and then try to get it back from the government.

6/20/06 Tr. at 36.

While payment of taxes would have further demonstrated Whittaker's detrimental reliance upon MCI's representations, the law is clear that the nonpayment of taxes does not deprive a party of her ownership rights in property.  Jones v. Flowers, 574 U.S. 220 (2006); United States v. Nat'l Bank of Commerce, 472 U.S. 713, 770 (1985).

Finally the Court's finding that Whittaker's reliance was not reasonable rings hollow. (Opinion at 14.)  It again ignores the context of the reliance, in response to a specific request to "cash out."  (6/20/06 Tr. at 14-16, 18; and Exh. 4; Exh. D.)  It ignores that the statement that there was "not formal plan in place" was consistent with Whittaker's experience.  She was not receiving account statements required by the Plan even though her address had not changed for the past 22 years.  (Id. at 6-7, 12-14, 16.)  When she had called to inquire about her account, Putnam could not locate it.  (Id. at 12, 16.)  After the Merger, the Plan in fact was moribund in terms of new contributions and the evidence showed that all other former directors of MCI had in fact gotten their money out.  (Fact Stip. 9; Helms Depo. at 64-69; Hutchins Depo. at 60-62)

The Putnam Email was not "an ambiguous and ill defined communication," as the Court suggests.  (Opinion at 15.)[8]  It came from the representative of Putnam that Whittaker had been referred to by MCI and had dealt with most recently.  (Fact Stip. ¶ 11; 6/20/06 Tr. at 14.)  It included a "cc" to Helms, the Senior Manager whom Whittaker had talked with about her account.  And it was a consistent with both Whittaker's exchanges of emails in the past on

---

8.   There is no ambiguity in the Putnam Email.  When properly read as a whole, giving sense to all it parts, it clearly states that the Plan limitations and restrictions have been removed, Whittaker's current account is now treated simply as an account with Putnam and the funds therein are available to her at any time.  Indeed, if there were any ambiguities, not only would it be customary to construe them against the drafters (Putnam and MCI), but in the context of a benefit plan that provides for accelerated payments of benefits without notice to the participant, the interpretation of this provision must be construed in favor of the beneficiary.  See Perreca v. Gluck, 295 F.3d 215, 223 (2d Cir. 2002) ("[A]mbiguities are construed in favor of the plan beneficiary." (quoting Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002)); Donovan v. Bierwirth, 680 F.2d 269, 271 (2d Cir. 1982) (decisions made by trustees of employee pension plans "must be made with an eye single to the interests of the participants and beneficiaries.")

multiple occasions to address plan issues and her prior conversation with Hutchins.  (See 6/20/06 Tr. at 15-16 and Exhs. 1 and 4.)

Whittaker's reasonable reliance was specifically induced in the Putnam Email by Hutchins' statements that she had communicated with the MCI representative who had access to the original documents and by validating that restrictions had in fact existed in the past, as Whittaker had recalled, but that the "waiting period no longer exists."  (Fact Stip. Exh. D.) Moreover, Whittaker's belief that the waiting period no longer existed was reasonable as it was consistent with the Plan provision that MCI may "accelerate the payment of benefits payable any time without the consent of the Participant . . ."  (Exh. B at 12.07 (emphasis added).)  Indeed, the notion that it was unreasonable for Whittaker to rely upon the Plan Trustee's direct response to her "cash out" request is itself unreasonable given the follow-up explanation in the Putnam Email that "what this means is that the funds in the current account are available to you whenever you choose to take them."

Likewise, the Bankruptcy Court's statement that it was "particularly negligent" for Whittaker not to "simply ask for formal confirmation of the transfer from the Trust, the creation of an account in her name or under her ownership, or the closing of the Trust" (Opinion at 15) ignores the fact that Whittaker had just asked for an explanation as to why she had not received any required account statements for over six months and whether she could cash out.  It's unreasonable to expect Whittaker (or anyone else) to have confirmed what had just been confirmed to her in writing by the parties with superior knowledge, who were in a confidential, if not a fiduciary relationship with her under the Plan and Trust.  See Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 45 (2d Cir. 1991) (fiduciary relationship under New York law includes "both technical fiduciary relations and those informal relations which exist whenever one [person]

28

trusts in, and relies upon, another," specifically the duty to disclose pertinent information (quoting <u>Penato v. George</u>, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900, 904-05 (2d Dep't 1976))); <u>In re Windsor Plumbing Supply Co.</u>, 170 B.R. 503, 526 (Bankr. E.D.N.Y. 1994) ("New York fiduciary law embraces not only the traditional trustee and beneficiary relationship, but also more informal relationships, where it is clearly evident that one party reasonably trusted another.")[9] The MCI and Putnam representatives knew Whittaker would be relying upon their response to her request concerning "removing funds" and that she would be relying on their representations when they stated: "As we also discussed, you are able to keep your account as-is" and it will be "viewed as simply an account with Putnam."  (Fact Stip., Exh. D.)

Instead of looking for excuses to find that Whittaker had acted unreasonably, the law instructs that the Bankruptcy Court should have instead shifted the burden onto MCI and Putnam to notify Whittaker that their advice was incorrect or ambiguous by telling her that if she actually wanted access to her account whenever she chose, she needed to remove the funds from that account.  <u>See</u> <u>Brass v. Am. Film Techs., Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993) (a duty to speak arises under New York law:  1) "where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth;" 2) "when the parties stand in a fiduciary or confidential relationship with each other;" or 3) "where one party possesses superior knowledge, not readily available to the other and knows that the other is acting on the basis of mistaken knowledge" (citations omitted)); <u>In re Ellison Assoc.</u>, 13 B.R. 661, 676 (Bankr. S.D.N.Y. 1981) (debtor who had a duty to speak concerning ownership where others were asserting claims to title was later estopped from asserting title to the property).  As the party with the superior knowledge and the legal

---

9.   The Plan is governed by New York law.  Fact Stip., Exh. B. at §12.08.

obligation to speak up, MCI should be estopped from contravening its specific written representations.

Finally, the Bankruptcy Court found that even assuming Whittaker's reliance was reasonable at the time of receipt of the Putnam Email, the following subsequent events rendered such reliance unreasonable:  Whittaker's failure to receive a 1099 tax form and her receipt of boiler plate language on page 4 of an account statement that she did not read.  (Opinion at 15-16.)  Rather than purportedly demonstrating "that Putnam and MCI did not share Whittaker's views," this unreceived tax form and unread boilerplate cannot be allowed to take precedence over the specific representation in the Putnam Email that her account was now treated simply as an account with Putnam in the absence of any contrary communication directly from Blackman, Helms, Hutchins or another MCI or Putnam representative.  See Aramony v. United Way of Am., 254 F.3d 403, 414 (2d Cir. 2001) ("[F]undamental rule of contract construction that specific terms and exact terms are given greater weight than general language."); Levine v. 860 West Tower, Inc., 96 Civ. 6124 (LAP), 1999 U.S. Dist. LEXIS 4430, [*]11 (S.D.N.Y. Mar. 31, 1999) ("[W]here there are general and specific provisions relating to the same matter, the specific provisions control, even if there is an inconsistency." (internal quotations omitted)).

Likewise, MCI's thought process should not be defined by these non-events as MCI cannot locate any records of the Plan administrator, Blackman.  Helms, the only other MCI representative involved in the matter understood Blackman's instructions to mean that Whittaker could have access to her account without qualification, did not contradict Blackman's instructions and conceded that the current Plan records may be mistaken.  Hutchins, the Putnam representative who is purportedly most knowledgeable about the Plan conceded that she did not even work on the Plan, did nothing one way or the other after conveying MCI's instructions and,

30

as Exhibit G demonstrates, had no accurate recollection of what was represented in the Putnam Email, the single business record of Putnam concerning Whittaker's account.

MCI, as Plan proponent, and Putnam, as Plan trustee, had a duty to speak up if they had miscommunicated in fact or if they thought their directions were ambiguous as they were the parties with superior knowledge and a duty to a Plan participant who they knew would be relying upon their response.  Indeed, their inaction when they had a duty to speak more fully demonstrates that they were in agreement with the Putnam Email and the accelerated payment of Whittaker's Plan benefits in the Putman Money Market account.  See Perreca v. Gluck, 295 F.3d 215, 224 (2d Cir. 2002) (ambiguities in benefit plans "are construed in favor of the plan beneficiary."); Donovan v. Bierwirth, 680 F.2d 269, 271 (2d Cir. 1982) (decisions made by trustees of employee pension plans required to "be made with an eye single to the interests of the participants and beneficiaries").[10]  Based upon its de novo review, this Court should not look to excuse their failures as the Bankruptcy Court sought to do, but should instead find that Verizon is now equitably estopped from disavowing the specific written representation in response to Whittaker's "cash-out" request which induced Whittaker to keep her funds in the Putnam Money Market account.

### D.    Solvent Verizon Should Be Directed to Pay Whittaker Her Plan Benefits

The Court concluded its Opinion by noting that the Debtors had not set forth a business judgment for rejecting the Deferral Agreement or Plan because "the Debtors are not rejecting either the Deferral Agreement or the Deferred Compensation Plan."  (Opinion at 18.)  Under

---

10.  See In re La Difference Rest., Inc., 29 B.R. 178, 180-81 (Bankr. S.D.N.Y. 1983) ("[I]f the language of the agreement is susceptible to more than one meaning, the one interpretation that operates against the party who prepared such form must be adopted."); Weichman Pig Co. v.Jack-Rich, Inc. (In re Jack-Rich, Inc.), 176 B.R. 476, 480 (Bankr. C.D. Ill. 1994) ("An instrument will be most strongly construed against the party who prepared it."); Restatement (Second) of Contracts § 206 (1981).

those circumstances, however, Verizon, as successor in interest to MCI under the Plan, should have been directed to resume the payment of benefits to Whittaker.

It is well settled that contracts which are neither assumed nor rejected are deemed to "pass through" the bankruptcy unaffected by the filing. Texaco Inc. v. Bd. of Comm'rs for the LaFourche Basin Levee Dist. (In re Texaco Inc.), 254 B.R. 536, 557 (Bankr. S.D.N.Y. 2000); In re Shoppers Paradise, Inc., 8 B.R. 271, 279 (Bankr. S.D.N.Y. 1980) ("Until assumed or rejected an executory contract or unexpired lease remains in force and if neither assumed nor rejected, passes with other property of the debtor to the reorganized corporation.").[11]

Under Section 3.2(d) and 3.3 of the Trust Agreement (Exh. C), "Trustee shall resume the payment of benefits to Plan participants" if MCI is no longer insolvent. After having found that MCI had not rejected the Plan, the Court should have taken the next step and found that since the Plan account had remained separate and intact at Putnam through MCI's emergence from bankruptcy and merger into Verizon, MCI is no longer insolvent and must not be permitted to confiscate Whittaker's fully-funded account. Thus, if this Court concurs with the Bankruptcy Court that the acceleration of payment of Whittaker's Plan account did not transfer ownership as a matter of law; that the Putnam email and other evidence presented, together with MCI's failure to retain records, did not evidence a transfer of ownership in fact; and that Whittaker did not reasonably rely upon the Putnam Email to estop Verizon from contradicting MCI's written

---

[11]. Accord In the Matter of Greystone III Joint Venture, 995 F.2d 1274, 1281 (5th Cir. 1991) (if a debtor neither assumes nor rejects an executory contract, the contract continues in effect); In re Cochise College Park, Inc., 703 F.2d 1339, 1352 (9th Cir. 1983) ("Until rejection, however, the executory contract continues in effect and the non-bankrupt party to the executory contract is not a creditor with a provable claim against the bankrupt estate"); In re Cajun Elec. Power Co-op Inc., 230 B.R. 715, 734 (M.D. La. 1999) (executory contracts which are neither assumed nor rejected during a Chapter 11 proceeding flow through the proceeding "without alteration"); Boland v. Parmelee, No. 96-CV-311 (RSP/GJD), 1997 U.S. Dist. LEXIS 16157, *14 (N.D.N.Y. Oct. 15, 1997) ("The effect of neither accepting nor rejecting an executory contract is that the contract remains in force."); see also N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 546 n.12 (1984) (Brennan, J., concurring and dissenting) ("In the unlikely event that the contract is neither accepted nor rejected it will 'ride through' the bankruptcy proceeding and be binding on the debtor even after a discharge is granted . . . . The nondebtor party's claim will therefore survive the bankruptcy proceeding.").

representations when it had a duty to speak, then it should direct the resumption of benefits to Whittaker under the Plan.  Verizon does not have to contribute anything further to Whittaker's fully-funded Plan account and would receive an unjust windfall if it does not resume payments to the sole remaining Plan beneficiary.  (See Exh. C at § 4.1 ("MCI shall have no right or power to direct Trustee to return to MCI . . . any of the Trust assets before all payment of benefits have been made to Plan participants  . . ." except in the event of insolvency.))  Contrary to the Bankruptcy Court's observation, Whittaker's argument for not allowing the Plan to be rejected is not "irrelevant" (Opinion at 18), but should have instead been addressed to grant her the relief she had requested and is due under the Deferred Compensation Plan.

## CONCLUSION

For the reasons stated herein, this Court should reverse the Bankruptcy Court and find as a matter of law and fact that the funds in the Putnam Money Market account are Whittaker's property, that Verizon, as successor to MCI, is estopped from denying that they are  Whittaker's property or, alternatively, that Verizon should continue to pay Whittaker Plan benefits.  This Court should also grant Whittaker such other and further relief as the Court deems just, including awarding her all accrued interest in her Money Market account, pre-judgment and post-judgment interest, attorneys fees and costs.

33

Dated: June 15, 2007

Respectfully submitted,

HUGHES HUBBARD & REED LLP

By: /s/ Daniel S. Lubell
    Daniel S. Lubell (DL-7932)
    One Battery Park Plaza
    New York, New York 10004-1482
    (212) 837-6000

    Counsel for Judith Whittaker

34