WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Marcia L. Goldstein, Esq. (MG 2606)
Lori R. Fife, Esq. (LF 2839)
Alfredo R. Pérez, Esq.
Adam P. Strochak, Esq. (AS 4104)

*Attorneys for Appellee*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
**In Re: WORLDCOM, INC.,**        :
       :
                  **Debtor.**     :
------------------------------------------------------------x
       :
**JUDITH WHITTAKER,**        :
              **Appellant,**     :
       :       **No. 07 Civ. 3408 (DLC)**
**v.**        :
       :
**VERIZON BUSINESS GLOBAL LLC, as**    :
**Successor to Reorganized Debtors, MCI**   :
**COMMUNICATIONS CORPORATION**   :
       :
              **Appellee,**     :
       :
------------------------------------------------------------x

## BRIEF OF APPELLEE VERIZON BUSINESS GLOBAL LLC

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF THE CASE........................................................................................ 3

STATEMENT OF THE FACTS ..................................................................................... 7

STANDARD OF REVIEW ........................................................................................... 11

ARGUMENT................................................................................................................. 12

     A.    The Bankruptcy Court Properly Interpreted Existing Case Law and the Provisions of the Deferred Compensation Plan Documents in Holding That Whittaker Was a General Unsecured Creditor .................. 12

     B.    The Bankruptcy Court Properly Found That The Trust Assets Were Not Distributed ............................................................................ 15

          1.    The Court Properly Found That Whittaker Provided No Evidence Sufficient to Establish a Distribution In Fact.............. 15

          2.    The Court Properly Held That Constructive Receipt for Tax Purposes Does Not Presuppose or Result in Actual Ownership or Possession for Purposes of State Property Law ............................................................................................ 19

     C.    The Bankruptcy Court Properly Held That Whittaker Was Not Entitled to the Remedy of Equitable Estoppel........................................ 21

     D.    The Deferred Compensation Plan Did Not "Pass Through" the Bankruptcy ........................................................................................... 24

CONCLUSION............................................................................................................. 26

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Bessemer City,*
    470 U.S. 564 (1985)................................................................................11, 16

*Bank of Am., N.A. v. Moglia,*
    330 F.3d 942 (7th Cir. 2003) .......................................................7, 12, 13, 18,

*Bayerische Hypo-Und Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A.
    (In re Enron Corp.),*
    292 B.R. 752 (Bankr. S.D.N.Y. 2003)..............................................................12

*Becker v. I.R.S.,*
    407 F.3d 89 (2d Cir. 2005)...............................................................................21

*Denton & Anderson Co. v. Induction Heating Corp.,*
    178 F.2d 841 (2d Cir. 1949)..............................................................................24

*Fellows, Read & Assocs. v. Rieder,*
    194 B.R. 734 (S.D.N.Y. 1996)...........................................................................11

*Goodman v. Resolution Trust Corp.,*
    7 F.3d 1123 (4th Cir. 1993) .......................................................................12, 13

*Kosakow v. New Rochelle Radiology Assocs.,*
    274 F.3d 706 (2d Cir. 2001)..............................................................................20

*In re Lomas Fin. Corp.,*
    117 B.R. 64 (S.D.N.Y. 1990)............................................................................11

*In re Manville Forest Prods. Corp.,*
    225 B.R. 862 (Bankr. S.D.N.Y. 1998)..............................................................24

*Manville Forest Prod. Corp-Gulf States Exploration Co. v. Manville Forest,*
    896 F.2d 1384 (2d Cir. 1990)...........................................................................11

*McAllister v. Resolution Trust Co.,*
    201 F.3d 570 (5th Cir. 2000) ...........................................................................13

*Resolution Trust Corp. v MacKenzie,*
    60 F.3d 972 (2d Cir. 1995)..........................................................12, 13, 14, 15

*Schmidt v. Polish People's Republic*,
   742 F.2d 67 (2d Cir. 1984)..........................................................................................23

*Truck Drivers Local 807, etc. v. Carey Transp., Inc.*,
   816 F.2d 82 (2d Cir. 1987)..........................................................................................23

*United States v. United States Gypsum Co.*,
   333 U.S. 364 (1948)....................................................................................................11

*Wainwright v. Witt*,
   469 U.S. 412 (1985)....................................................................................................11

*Westport Bank and Trust Co. v. Geraghty*,
   90 F.3d 661 (2d Cir. 1996)..........................................................................................12

*In re WorldCom, Inc.*,
   No. 02-13533 (AJG) (Jointly Administered) 2007 Bankr. LEXIS 896
   (Bankr. S.D.N.Y. Mar. 27, 2007)..................................................................................5

## STATUTES

11 U.S.C. § 101(5) (2006) ............................................................................................24

11 U.S.C. § 524(a) (2006)............................................................................................24

11 U.S.C. § 1141(d)(1)(A) (2006) ..............................................................................24

Fed. R. Bankr. P. 8013 ...........................................................................................11, 23

Fed. R. Civ. P. 52(a) .....................................................................................................11

## MISCELLANEOUS

Mertens Law of Federal Income Taxation § 25B.212 (1988) ......................................14

## PRELIMINARY STATEMENT

Reorganized Debtor/Appellee Verizon Business Global LLC (formerly known as WorldCom, Inc.) ("Reorganized Debtor") submits this brief in support of its position on appeal. This appeal arises from the bankruptcy of WorldCom, Inc. and its subsidiaries. Judith Whittaker ("Whittaker") is a former director of Debtor MCI Communications Corporation ("MCI"), and a former member of the MCI Board of Directors' Compensation Committee. Whittaker also is a lawyer and served as General Counsel of a large corporation. Whittaker participated in the MCI Board of Directors Deferred Compensation Plan (the "Deferred Compensation Plan"). The parties agree that, as of June 30, 2002, Whittaker had a balance of $345,183 in her deferred compensation account.

On July 21, 2002, WorldCom, Inc. and its subsidiaries, including MCI, filed for bankruptcy under chapter 11, title 11 of the United States Code, in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). As this Court is well aware, most unsecured creditors received substantially less than full recovery on their claims. The dispute in this matter is whether Whittaker should be treated as an unsecured creditor with respect to her deferred compensation account, or whether she is entitled to payment in full. There is no dispute that, under the governing Deferred Compensation Plan documents, Whittaker is an unsecured creditor and does not have an ownership interest in funds MCI placed in a rabbi trust related to the Deferred Compensation Plan (the "Trust"). Whittaker contends, however, that an email dated November 20, 2001 (the "November 20th email"), from Putnam Investments, the administrator hired by MCI to manage the Deferred Compensation Plan and the Trust, either effected a distribution of trust assets to her, or represented that there were no obstacles to ending

the deferral agreement, thereby "vesting" Whittaker with ownership and possession of her deferred compensation account.

Whittaker filed proof of claim number 3785 in the bankruptcy for $345,183 in "wages, salary, and compensation" and did not assert on the proof of claim form any entitlement to secured or priority status.  By stipulation, MCI agreed to an allowed Class 6 general unsecured claim in the amount of $345,183 and paid that claim in accordance with the Plan of Reorganization, without prejudice to the parties' arguments as to the status of the deferred compensation account.  (Class 6 creditors recovered approximately one-third of the value of their claims.)  The parties then tried the matter in the Bankruptcy Court.

After hearing the evidence, including the testimony of Whittaker, the Bankruptcy Court determined that Whittaker's status was as an unsecured creditor, and she therefore was not entitled to anything more than payment on her unsecured claim, which she already had received. This matter involves no dispute regarding the law governing Whittaker's claim and the decision of the Bankruptcy Court turned on its findings of fact and its rejection of Whittaker's own testimony as "implausible."  Under the applicable standard of review, this Court should reverse only if it finds clear error in the Bankruptcy Court's findings of fact, and should give great deference to matters of credibility, which the Bankruptcy Court is in a much better position to judge having heard Whittaker's testimony.  The Bankruptcy Court's findings of facts here are well supported by the record and, far from being clearly erroneous, are plainly correct.  And because the key to this case is the Bankruptcy Court's conclusion that Whittaker's reliance on a brief and, at best, ambiguous email was "implausible" based on her own testimony, this Court should affirm.

The Reorganized Debtors take no pleasure in denying payment to Whittaker of money she earned in serving as a member of the MCI Board of Directors. But that is the unfortunate result compelled by the Bankruptcy Code and the unambiguous terms of the Deferred Compensation Plan. Paying Whittaker in full for the value of her deferred compensation account improperly would elevate her claim over those of thousands of general unsecured creditors who received far less.

For the reasons set forth below, the Bankruptcy Court properly held that Whittaker's rights under the Deferred Compensation Plan are as a general unsecured creditor. This Court should affirm the Bankruptcy Court's judgment finding that Reorganized Debtors have satisfied their obligations under the Deferred Compensation Plan by paying claim number 3785 in accordance with the Plan of Reorganization.

## STATEMENT OF THE CASE

On July 21, 2002, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Bankruptcy Court approved the Debtor's Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan") on October 31, 2003. The Plan became effective on April 20, 2004 and WorldCom emerged from bankruptcy under the name MCI, Inc. On January 6, 2006, the Reorganized Debtor merged with Verizon Communications, Inc. Reorganized Debtor MCI, Inc. is now known as Verizon Business Global LLC.

In accordance with procedures approved by the Bankruptcy Court, on September 19, 2003, the Debtors filed a Notice of Rejection of the Deferred Compensation Plan. (Whittaker Designation Exh. 1, Docket 9016.) Whittaker objected, contending the Deferred Compensation Plan was a non-executory contract not subject to rejection. (Whittaker Designation Exh. 4,

3

Docket 10606.)  The Debtors subsequently withdrew the Notice of Rejection.  (Whittaker

Designation Exh. 6, Docket 12815.)  Whittaker subsequently objected to the withdrawal of the

Notice of Rejection, and the Court reinstated it.  (Whittaker Designation Exh. 7, Docket 12904.)

   Concurrent with the proceedings regarding rejection of the Deferred

Compensation Plan, the Reorganized Debtors were working to complete the process of filing

claim objections in accordance with the deadline set forth in the Plan.  On September 2, 2004,

MCI filed an individual objection to Whittaker's claim seeking a ruling that it should be treated

as a general unsecured claim and that Whittaker was not entitled to payment in full, as she was

claiming in connection with the Notice of Rejection.  (Whittaker Designation Exh. 5, Docket

12359.)

   The parties appeared at a hearing on November 16, 2004 and informed the

Bankruptcy Court of an agreement partially resolving their disputes and establishing procedures

for resolution of the remaining disputed issues.  Specifically, the Reorganized Debtors agreed to

pay Whittaker an allowed general unsecured claim in the aggregate amount of $345,183.  The

parties' agreements were set forth in a stipulation entered by the Court on December 28, 2004

(Whittaker Designation Exh. 10, Docket 14749).

   Discovery proceeded and the Bankruptcy Court held an evidentiary hearing on

June 20, 2006.  (See Transcript of June 20, 2006 hearing ("Jun. 20, 2006 Tr."); Whittaker

Designation Exh. 15, Docket No 18792).  The parties stipulated to a series of undisputed facts on

May 23, 2006.  Stipulation of Undisputed Facts ("Facts Stip.") (Whittaker Designation Exh. 12,

Docket 18280).  The parties further agreed that the testimony of two witnesses – Raymond

Helms, an employee in the benefits department of the Debtors, and Deborah Hutchins, an

employee of Putnam Investments – would be presented by deposition transcript. (Facts Stip.,

Exh. I – "Helms Depo."; Facts Stip. Exh. J – "Hutchins Depo.").  Whittaker testified live at the hearing.

On March 27, 2007, the Bankruptcy Court issued an opinion granting the Debtors' Objection to Whittaker's Proof of Claim No. 3785 ("Opinion") and holding that Whittaker's claim was a general, unsecured claim.  In re WorldCom, Inc., No. 02-13533 (AJG) (Jointly Administered), 2007 Bankr. LEXIS 896 (Bankr. S.D.N.Y. Mar. 27, 2007) (Whittaker Designation Exh. 16, Docket 18790).  In reaching its holding, the Bankruptcy Court noted that Whittaker could only establish an ownership interest in the trust assets "if the Putnam Email distributed the Trust Assets, or represented that the Trust Assets had been distributed" and held correctly that Whittaker "failed to establish that the Trust Assets were distributed."  (Opinion at 6, 8.)  Specifically the Opinion found that Whittaker's argument was "flawed" and rested on a "misapplication" of the constructive receipt doctrine found in tax law to the issue of  actual ownership of the trust assets, an issue of property law.  (Id. at 8.)  The Bankruptcy Court explained that "constructive receipt for tax purposes does not transmute a claim into actual possession" and held that regardless of "whether or not the Debtors removed the 'substantial limitations' to Whittaker's ability to receive funds from the Trust, such fact alone is insufficient to establish that the Trust Assets were distributed to Whittaker."  (Id. at 9, 10.)

After rejecting Whittaker's "constructive receipt" argument as flawed, the Bankruptcy Court then considered whether the trust assets were distributed in fact.  The Court held that "the factual record belies any suggestion that the Trust Assets were distributed in fact" and noted that Whittaker had not identified documents recording a transfer of trust assets, nor any documents demonstrating that the trust was closed, nor any records demonstrating an actual

change in ownership of the account. (Id. at 10.)  The Bankruptcy Court then held that Whittaker

had failed to meet the burden of establishing that the trust assets were distributed in fact.  (Id.)

        The Bankruptcy Court next found that Whittaker had failed to establish the

necessary elements for an equitable estoppel claim.  First, the Bankruptcy Court noted that

Whittaker failed to establish that the November 20th email was a definite misrepresentation given

her failure to identify how the email "directly represented that she owned the Trust Assets."  (Id.

at 12-13.)  Second, even assuming the email to be a misrepresentation, the Bankruptcy Court

held that Whittaker had failed to prove reliance on the email, specifically noting that Whittaker's

statements as to her reliance were "not supported by Whittaker's actions at the time" and that

"[t]he more plausible conclusion consistent with the facts is that Whittaker did not believe she

owned the Trust Assets and therefore did not rely on the Putnam Email." (Id. at 13-14.)

        Finally, the Bankruptcy Court found that even if Whittaker could establish that

she relied on the alleged misrepresentation, such reliance would not have been "reasonable,"

concluding that "[a]s an experienced corporate attorney and former member of the Compensation

Committee, Whittaker should have known that an ambiguous and ill-defined communication

purporting to state that Whittaker was now the owner of the Trust Assets could not, standing

alone, be relied upon as an accurate reflection of fact."  (Id. at 15.)

## STATEMENT OF THE FACTS

        The Deferred Compensation Plan permitted MCI board members to defer the

compensation they received for their services.  (Facts Stip. Ex. B, at § 4.01.)  Deferred

compensation was credited to a participant account managed by an outside investment service, in

this case Putnam Investments.  Participants had the option of selecting investment options similar

to those provided under the company's retirement savings plan.  The Deferred Compensation

Plan, however, makes clear that the company is not obligated to fund a deferred compensation

account in advance of a request for a distribution by the participant.  It specifically provides:

> 11.01   Company's Obligation.  The Company's obligations under
> this Plan shall be an unfunded and unsecured promise to pay.  The
> Company shall not be obligated under any circumstances to fund
> its financial obligations under this Plan.

(Facts Stip. Ex. B, at § 11.01.)  The Deferred Compensation Plan further states that "a *deemed*

rate of return shall be credited to a Participant's Account" and that the company "will *deem*

Deferred Compensation to be invested in investment options" chosen by the participant.  (Id.

§§ 5.01, 5.03) (emphasis added).  Deferred compensation accounts thus tracked the market

performance of the investments chosen by the participant but did not represent actual cash

purchases of shares or units as might be the case with a regular brokerage or mutual fund

account.

Participation in the Deferred Compensation Plan was initiated by execution of a

deferral agreement.  Whittaker executed a deferral agreement on June 27, 1994.  (Facts Stip. Ex.

A.)  Whittaker elected to defer 100% of her retainer and meeting fees and opted to receive her

deferred compensation in 10 annual installments commencing in 2003.  (Id. at § 1.) The deferral

agreement included the following language, in a distinctive typeface:  "I ACKNOWLEDGE

THAT MY ELECTION IS IRREVOCABLE FOR THE DEFERRAL COVERED BY THIS

AGREEMENT."  (Id. at §4.)

Although it was not required to do so, MCI established a trust as a hedge against

investment fluctuation and corresponding financial risk to the company.  (Facts Stip. Ex. C;

Helms Depo. at 94.)  This type of trust is known as a "rabbi trust."  (Helms Depo. at 94.); see

generally Bank of Am., N.A. v. Moglia, 330 F.3d 942, 944 (7th Cir. 2003) (describing the

genesis of the term "rabbi trust," its characteristics and the tax considerations underlying its

creation).  The preamble to the rabbi trust agreement establishes unequivocally that funds in the

trust are subject to claims of MCI's creditors:

> WHEREAS MCI wishes to establish a trust. . .and to contribute to
> the Trust Assets that shall be held therein, subject to the claims of
> MCI's creditors in the event of MCI's Insolvency. . .until paid to
> Plan participants and their beneficiaries. . .

(Facts Stip. Ex. C.) (third "whereas" clause).  The rabbi trust agreement goes on to establish that

Deferred Compensation Plan participants have no preferential rights to trust assets:

> Plan participants and their beneficiaries shall have no preferred
> claim on, or any beneficial ownership interest in any assets of the
> Trust.  Any rights created under the Plan and this Trust Agreement
> shall be mere unsecured contractual rights of Plan participants and
> their beneficiaries against MCI.

(Id. § 1.4.)  And if that were not enough, section 3.2 of the Trust Agreement provides:  "At all

times during the continuance of this Trust, as provided in Section 1.4 hereof, the *principal and*

*income of the Trust shall be subject to claims of general creditors of MCI* under federal and state

law as set forth below." ( Id. § 3.2) (emphasis added).  In the event of the insolvency of MCI, the

trust agreement categorically precludes the trustee from distributing any trust assets to Deferred

Compensation Plan participants:  "If at any time the Trustee has determined that MCI is

insolvent. . .Trustee shall discontinue payments to Plan participants or their beneficiaries and

shall hold the assets of the Trust for the benefit of MCI's general creditors."  (Id. § 3.2(c).

        In November 2001, Whittaker contacted Deborah Hutchins, a representative of

Putnam, seeking information regarding the status of her account and requesting copies of account

statements.  According to Hutchins, one of the topics discussed in that conversation was whether

Whittaker could leave her account in its current status (that is, as deferred compensation account, not an ordinary investment account):

> Q.     . . .So do I understand you correctly to say that she was inquiring as to whether she was permitted to keep her account in the current status?
>
> A. Correct.
>
> . . .
>
> Q.     And she articulated some concern to you about the possibility of a forced distribution?
>
> A.     Right.  Where it – there's no holding period or however they refer to it until 2003, was she going to be – you know, will her account just stay the same, can she just leave it as is.

(Hutchins Depo. at 106-07.)  Hutchins contacted David Blackman, a senior manager at MCI.  He provided answers to Whittaker's questions, which Hutchins transcribed verbatim into an email which she in turn sent to Whittaker on November 20, 2001.  (Facts Stip. Ex. D; Hutchins Depo. at 71.)

The November 20th email states that "there is no longer a formal plan in place." (Facts Stip. Ex. D.)  This statement was inaccurate – the Deferred Compensation Plan had not been terminated by any formal or informal action of the company.  Helms confirmed so in his deposition:

> Q.     Do you know whether it's [the Deferred Compensation Plan] been terminated?
>
> A.     I know that it has not been terminated.

(Helms Depo. at 11.)  The email also states that "this is viewed simply as an account with Putnam."  (Facts Stip. Ex. D.)  Hutchins explained in her deposition, however, that the email did not effect any change in the status of Whittaker's deferred compensation account and that it

remained an account "under the MCI umbrella." (Hutchins Depo. at 79.) Indeed, the November

20th email expressly advised Whittaker that, if she wished to close out her deferred

compensation account she was required to submit a written letter of instruction, signed and

notarized. (Facts Stip. Ex. D.) And Hutchins testified that any such letter requesting distribution

would have to be approved by MCI before Putnam would act on it. (Hutchins Depo. at 80, 87-

88.) The email concluded that Whittaker could keep her account "as-is" if she so desired. (Facts

Stip. Ex. D.) Hutchins testified about her understanding of this final sentence:

> There was not going to be any change to the account at all. That's
> what I was saying to her.

(Hutchins Depo. at 115.)

It is undisputed that, after receipt of the November 20th email, Whittaker did not

submit any written request for a distribution from her account. (Facts Stip. ¶ 13.) It likewise is

undisputed that Whittaker never received any tax information form showing that the value of her

deferred compensation account had been reported to any federal or state taxing authority as

income, and that she never declared it as income on any tax return. (Id. at ¶ 15.) And between

November 2001 and the commencement of the bankruptcy, Whittaker received at least one

quarterly account statement printed with the caption "MCI Communications Corporation, MCI

Board of Directors" and bearing the MCI logo. (Facts Stip. ¶ 14 & Ex. E.) Every account

statement containing the followed notation:

> The funds in this account belong to your company. The value of
> the account measures the unsecured promise of your company to
> pay benefits under the company's non-qualified plan, but the
> existence of the account does not give you or your beneficiary any
> ownership rights to these or any other assets of the company.

(Facts Stip. Ex. E.)

## STANDARD OF REVIEW

The Bankruptcy Court's conclusions of law are reviewed *de novo*.  Manville Forest Prods. Corp-Gulf States Exploration Co. v. Manville Forest, 896 F.2d 1384, 1388 (2d Cir. 1990).  The Bankruptcy Court's findings of fact are reviewed under the clearly erroneous standard.  Fed. R. Bankr. P. 8013; Fellows, Read & Assocs. v. Rieder, 194 B.R. 734, 737 (S.D.N.Y. 1996).  The Bankruptcy Court's factual findings should not be disturbed absent a finding of clear error and this Court and may reverse only if "'left with the definite and firm conviction that a mistake has been committed.'"  In re Lomas Fin. Corp., 117 B.R. 64, 66 (S.D.N.Y. 1990) (quoting Manville Forest Prods., 896 F.2d at 1388 and United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

The Federal Rules of Bankruptcy Procedure mandate that "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."  Fed. R. Bankr. P. 8013; see also Fed. R. Civ. P. 52(a).  It is well accepted that a trial court's findings regarding the credibility of witnesses demand "even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."  Anderson v. Bessemer City, 470 U.S. 564, 575 (1985) (quoting Wainwright v. Witt, 469 U.S. 412 (1985)).  Notably, the Supreme Court has held that where a trial judge's finding regarding the credibility of witnesses "is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."  Id. at 575.

11

## ARGUMENT

A.     **The Bankruptcy Court Properly Interpreted Existing Case Law and the Provisions of the Deferred Compensation Plan Documents in Holding That Whittaker Was a General Unsecured Creditor**

It is axiomatic that a contract will be interpreted in accordance with its plain and ordinary meaning.  Bayerische Hypo-Und Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A. (In re Enron Corp.), 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003); see also Moglia, 330 F.3d at 946 (judges generally will interpret a rabbi trust agreement in accordance with the "conventional meaning" of its terms).  Here, the legal documents creating the deferred compensation arrangement unambiguously provided that Whittaker's status was as a general unsecured creditor, and that she had no ownership interest in her deferred compensation account. The Deferred Compensation Plan itself so provided.  (Facts Stip. Ex. B, at §§ 11.01, 11.02.)  And the rabbi trust agreement likewise provided that Whittaker had "no preferred claim on, or any beneficial ownership interest in any assets of the Trust."  (Facts Stip. Ex. C, at § 1.4.)  This type of deferred compensation plan is common and courts have held repeatedly that assets in a rabbi trust remain the property of the trust grantor (here, MCI) until they are distributed to plan participants.  Westport Bank and Trust Co. v. Geraghty, 90 F.3d 661, 669 (2d Cir. 1996); Resolution Trust Corp. v MacKenzie, 60 F.3d 972, 976 (2d Cir. 1995); Goodman v. Resolution Trust Corp., 7 F.3d 1123 (4th Cir. 1993).

The rabbi trust agreement spelled out the duties of the trustee in the event of the insolvency or bankruptcy of MCI and its language could not be more straightforward:  "Trustee shall cease paying benefits to Plan participants and their beneficiaries if MCI is insolvent." (Facts Stip. Ex. C, at § 3.1.)  At all times both the principal and income of the trust "shall be subject to claims of general creditors of MCI . . ."  (Id. at § 3.2.)  And once the trustee

determined MCI was insolvent or bankrupt, it was bound to "hold the assets of the trust for the

benefit of MCI's general creditors."  (Id. at § 3.2(c).)  Under the Deferred Compensation Plan

documents, Whittaker had no status except that of general unsecured creditor, and no claim to

ownership of any funds in the rabbi trust.

Whittaker has suggested in pleadings and in arguments before the Bankruptcy

Court that MCI acted arbitrarily in refusing to pay her in full for what she characterized as

"retirement" benefits.  The limitations on Whittaker's rights to her deferred compensation

account, however, were not ones arbitrarily imposed by MCI.  The Deferred Compensation Plan

carefully conformed to the requirements of applicable tax laws so that participants lawfully could

defer payment of federal and state income taxes on deferred compensation and any investment

earnings.  See McAllister v. Resolution Trust Co., 201 F.3d 570, 574 (5th Cir. 2000) (explaining

that "the Internal Revenue Code requires beneficiaries to hold only a limited interest in the trust

assets prior to distribution.  Specifically the Code requires that all trust assets be property of the

employer, and therefore subject to the claims of creditors of the employer"); Moglia, 330 F.3d at

944 (explaining that "unless an executive's right to receive money from the [rabbi] trust is

'subject to substantial limitations or restrictions,' rather than being his to draw on at any time. .

.the executive must include any contribution to the trust and any interest or other earnings of the

trust in his gross income in the year in which the contribution was made or the interest

obtained."); MacKenzie, 60 F.3d at 976-77 (noting that section 671 of the Internal Revenue

Code – 11 U.S.C. § 671 – treats the grantor as the owner of rabbi trust assets, thus making the

trust assets taxable to the grantor, until those trust assets are distributed to the grantee);

Goodman, 7 F.3d at 1127 ("Federal tax law conditions the beneficial tax treatment of a grantor

trust on the requirement that the trust fund remains subject to the claims of the employer's

creditors as if the assets were the general assets of the employer.") (citing Mertens Law of

Federal Income Taxation § 25B.212 (1988)).  The Deferred Compensation Plan and rabbi trust

agreement here satisfied the "substantial limitations or restrictions" requirement of the Internal

Revenue Code by specifying that the deferral election by the plan participant is irrevocable and

any funds in the rabbi trust remain subject to the claims of general creditors.  As a result,

Whittaker received "only the company's unsecured promise to pay benefits and [had] no rights

against any assets other that the rights of a general unsecured creditor of the company."  Mertens

Law of Federal Income Taxation § 25B.212 (2007).

       Nor did MCI act arbitrarily in freezing Whittaker's deferred compensation

account once it filed for bankruptcy.  It was obligated to do so by the requirements of the

Deferred Compensation Plan and the rabbi trust agreement.  Doing anything else would have

been inconsistent with the duties of a chapter 11 debtor.  Indeed, it would have been arbitrary to

pay Whittaker – a former director of the company – in full when other unsecured creditors of

MCI received far less under the Plan of Reorganization.

**B.**    **The Bankruptcy Court Properly Found That The Trust Assets Were Not Distributed**

       Given the "substantial limitations or restrictions" requirement of the Internal

Revenue Code, it is solely "the act of distribution which conveys the assets held in a grantor trust

from the grantor to the grantee."  MacKenzie, 60 F.3d at 977.  As the Bankruptcy Court properly

noted, Whittaker's assertion of an ownership interest in the trust assets therefore rests solely "on

the purported or imputed effects" of the November 20th email.  (Opinion at 5.)

       1.    The Court Properly Found That Whittaker Provided No Evidence Sufficient to Establish a Distribution In Fact

In order to establish an ownership interest in the deferred compensation funds, Whittaker needed to establish that the November 20th email either distributed the funds in her deferred compensation account or represented that the funds had been distributed.  The Bankruptcy Court properly found that the November 20th email effectuated no such distribution. (Opinion at 10.)  The November 20th email states "the funds in the current account are available to you whenever you choose to take them . . . In order to close out your account, and receive a check, we will need a letter of instruction from you."  (Facts Stip., Exh. D.)  At best, the November 20th email could be read to suggest that MCI would have consented to early termination of Whittaker's deferral period if she had submitted a written request that it do so. She never took that step before the bankruptcy.  Accordingly, under controlling Second Circuit case law, the assets held in the rabbi trust remained the property of the grantor (MCI) and never became Whittaker's property.  MacKenzie, 60 F.3d at 976 (holding that assets of rabbi trust established in connection with executive deferred compensation plan were assets of the employer, not the employee).

        The Bankruptcy Court noted that "a distribution would necessarily have been made" if the trust assets been transferred out of the Trust to a general Putnam account or an account specifically created for and belonging to Whittaker.  But after careful review of the evidence, the Bankruptcy Court found the "factual record belies any suggestion that the Trust Assets were distributed in fact."  (Opinion at 10.)  The court specifically noted the lack of any documents identifying a transfer of trust assets even just from one form of Putnam account to another.  The court also noted that Whittaker had not shown that the Trust was closed and

produced no records reflecting a change in ownership.[1]  This finding is not clearly erroneous in light of Helms' unambiguous testimony that the Deferred Compensation Plan had not been terminated and the account statements Whittaker received from Putnam after the November 20th email showing the same account number and containing the same cautionary statement to the effect that "[t]he funds in this account belong to your company . . . the existence of the account does not give you . . . any ownership rights to these or any other assets of the company."  (Helms Depo. at 11, 40; Facts Stip. Exh. E.)

Indeed, while it is true that certain portions of the November 20th email from Hutchins could be read to suggest Deferred Compensation Plan had terminated, in actuality it continued to exist and Whittaker's account never was distributed to her.  (Helms Dep. at 11, 40.)  Whittaker could point to no formal or informal action terminating the Deferred Compensation Plan by anyone at MCI because none exists.

The Bankruptcy Court properly weighed the evidence presented and made a factual finding that there had been no distribution in fact of the trust assets.  This finding is amply supported by the record, and even if this Court were to conclude there are "two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous" and must therefore be upheld.  Anderson, 470 U.S. at 574.

Appellant claims that given the unavailability of the records of the person responsible for administration of the Deferred Compensation Plan, former MCI employee David Blackman, she should not be "charged with the burden of producing such critical records but

---

[1] The Bankruptcy Court further noted that even if Whittaker had successfully produced such records, the distribution would have been of questionable validity given the provision of the Deferred Compensation Plan requiring that "all distributions of a Participant's Account shall be made in cash only."  (emphasis added) (Opinion at 11; Facts Stip., Exh. B at 7.)

instead must be afforded the inference that Blackman's records were consistent with his instructions in the Putnam email." (Initial Br. at 21). In effect, Whittaker asks this Court to draw an adverse inference against the Debtors due to the alleged absence of records. But as an appellate tribunal, it is not this Court's role to draw adverse inferences. And the Bankruptcy Court below did not abuse its discretion by not drawing any adverse inference, particularly as Whittaker never formally asked for one.

The discovery issues noted in Appellant's initial brief were addressed in the June 20, 2006 hearing before The Bankruptcy Court. There, counsel for Whittaker requested sanctions for alleged discovery abuse. In addressing these accusations, Reorganized Debtors' counsel assured the Court that, contrary to opposing counsel's insinuations, a careful search had been made for all documents relating to the Deferred Compensation Plan and Whittaker's account and every responsive document that could be located was in fact produced, including Whittaker's Deferral Agreement, the Deferred Compensation Plan, the rabbi trust agreement, emails relating to Whittaker's account, copies of account statements, and all records from Putnam.

Blackman had left MCI before discovery commenced, but even so the Reorganized Debtors searched to see if they could locate any files he may have personally maintained related to the Deferred Compensation Plan and found none. (Jun. 20, 2006 Tr. 66: lns 9-25.) As explained in the June 20th hearing, the absence of such records is far from sinister and is not surprising given that there were only a "handful" of participants in the Deferred Compensation Plan. (Jun. 20, 2006 Tr. 67: 1-6.) Searching for records and finding none is very different from searching for records and learning they have been affirmatively destroyed. The former is what happened here. Recognizing this, following the June 20th hearing counsel for

17

Whittaker expressly withdrew the demand for discovery sanctions.  See Letter from D. Lubell to the Hon. Arthur J. Gonzalez, June 26, 2006 (Whittaker Designation Exh. 14, Docket 18398).  All discovery issues were thus resolved and Whittaker has not preserved for appeal any request for an adverse inference as a sanction for any imagined flaws in the Reorganized Debtors' discovery responses.

> 2.     The Court Properly Held That Constructive Receipt for Tax Purposes Does Not Presuppose or Result in Actual Ownership or Possession for Purposes of State Property Law

The Bankruptcy Court noted that Whittaker's argument below misapplied a doctrine of tax law, the constructive receipt doctrine, to an issue of property law, the ownership of the trust assets. (Opinion at 8.)  Courts have recognized that "unless an executive's right to receive money from the [rabbi] trust is 'subject to substantial limitations or restrictions,' rather than being his to draw on at any time. . .the executive must include any contribution to the trust and any interest or other earnings of the trust in his gross income in the year in which the contribution was made or the interest obtained."  Moglia, 330 F.3d at 944.  Conversely, Whittaker argued that the November 20th email eliminated all "substantial limitations" on her right to withdraw her deferred compensation, and therefore was a "distribution."  (Whittaker's Pre-Hearing Memorandum, at 16; Whittaker Designation Exh. 13, Docket 18331).  The Bankruptcy Court correctly rejected this argument, holding that "constructive receipt for tax purpose does not transmute a claim into actual possession" and "it is simply incorrect as a matter of law and as a matter of logic to suggest that constructive receipt for tax purposes necessarily presupposes or results in actual ownership or possession for the purposes of state property law." (Opinion at 9.)

18

Appellant's brief misapprehends the Bankruptcy Court's holding with respect to the constructive receipt doctrine.  The Bankruptcy Court did not base its decision on any finding that no constructive receipt had occurred under the tax laws.  Indeed, it stated clearly that "<u>whether or not</u> the Debtors removed the 'substantial limitations' to Whittaker's ability to receive funds from the Trust, such fact alone is insufficient to establish that the Trust Assets were distributed to Whittaker." (emphasis added) (Opinion at 9-10.)  Thus, the touchstone was whether there had been an actual distribution.

Misinterpreting the Bankruptcy Court's constructive receipt analysis, Appellant claims an equitable interest in the trust assets sufficient that the funds be considered Whittaker's property under state law and the Bankruptcy Code.  (Initial Br. 15.)  Appellant further claims a right of unqualified control over the funds giving rise to ownership and possession under state property law and the Bankruptcy Code.  (<u>Id.</u> at 17.)  However, the Bankruptcy Court made a specific finding that there had been no such distribution of the trust assets (Opinion at 10), and Whittaker points to no facts in the record to support her argument that she gained control over her account.  Whittakers' citation to case law holding that employees may have equitable interests in certain funds held by their employers is unavailing.  (Initial Br. at 15.)  None of these cases involve deferred compensation plans or rabbi trusts.  The language of the applicable agreements here makes it perfectly clear that Whittaker's relationship to MCI was as a creditor, with no beneficial interest in assets of the Trust until such time as a distribution actually was made.  (Facts Stip. Ex. C, at § 1.4.)  The Bankruptcy Court correctly ruled that Whittaker had no ownership interest in any assets of MCI or the rabbi trust.

**C.**      <u>The Bankruptcy Court Properly Held That Whittaker Was Not Entitled to the Remedy of Equitable Estoppel</u>

Having failed to establish that any distribution of the trust assets took place, Whittaker sought in the alternative to estop Debtors from claiming ownership of the trust assets. "Under federal law, a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe the other party will rely upon it; 2) and the other party <u>reasonably</u> relies upon it; 3) to her detriment." <u>Kosakow v. New Rochelle Radiology Assocs.</u>, 274 F.3d 706, 725 (2d Cir. 2001).

The Bankruptcy Court correctly found that Whittaker's claim to equitable estoppel was flawed in several respects, noting that Whittaker's estoppel argument was once again founded on an "erroneous application" of the "constructive receipt doctrine" whereby Whittaker argued that if certain statements in the November 20th email were taken to be true then she was "vested with ownership of the assets when the Plan restrictions were removed and her account became a regular Putnam account." (Whittaker's Pre-Hearing Memorandum, at 17.) This argument yet again confounds "constructive receipt" for tax purposes with actual ownership for property law purposes. The alleged misrepresentation in the November 20th email to the effect that the "substantial limitations" were removed does not, by itself, estop the Debtors from denying that Whittaker is the owner of the Trust assets because constructive receipt of income for tax purposes is not the same thing as ownership of property.

Even assuming that the November 20th email did misrepresent Whittaker's ownership of the trust assets, the Bankruptcy Court concluded that Whittaker had not established actual reliance on the email. The Bankruptcy Court made a factual finding that Whittaker's purported reliance was not supported by her actions at the time. Specifically, the Bankruptcy

Court found that Whittaker did not identify any affirmative action taken in reliance on the email. (Opinion at 13.) The evidence presented supports this finding. Perhaps most notably, despite the requirement contained in the November 20th e-mail that a signed, notarized letter be presented in order to close the account, Whittaker took no such action. (Facts Stip. D.) Indeed, the court noted that Whittaker's failure to withdraw the trust assets could have just as likely been based on a belief that she did not own the trust assets as from a belief that she was the actual owner. (Opinion at 13.) This finding is not clearly erroneous. Indeed, there is evidence in the record suggesting that Whittaker may have been concerned about the possibility of a forced distribution and elected to leave her account "as-is" to continue the deferral of the obligation to pay income taxes on the value of the account. (Hutchins Depo. at 105-107.) Additionally, the Bankruptcy Court found Whittaker's failure to declare the Trust assets as income on her income tax returns for 2002 inconsistent with her claim of reliance on the email as a representation that she owned the funds:

> it seems implausible that Whittaker would have both believed she had received roughly $345,000 in income and failed to act in most logical fashion upon that belief, namely, declaring that income on her tax return. The more plausible conclusion consistent with the facts is that Whittaker did not believe she owned the Trust Assets and therefore did not rely on the Putnam Email.

(Opinion at 14.) Here there can be no "definite and firm conviction that a mistake . . . [was] committed" therefore the Bankruptcy Court's findings must not be disturbed.

Even if Whittaker could prove reliance on the November 20th email, the Court concluded that such reliance was unreasonable. (Id.) Reliance is reasonable where "the party claiming estoppel did not know nor should it have known that its adversary's conduct was misleading." Becker v. I.R.S., 407 F.3d 89, 99 (2d Cir. 2005). The Bankruptcy Court held that Whittaker would therefore need to show that she neither knew nor should have known that the

November 20th email did not "accurately describe her ownership interests in the Trust Assets."
(Opinion at 14.)  The Bankruptcy Court found it highly improbable that a member of the MCI
Board of Directors, and more particularly, a member of the MCI Board of Directors'
Compensation Committee, as well as an experienced corporate attorney and general counsel for a
major corporation, would reasonably rely on an informal email communication:  "Whittaker
should have known that an ambiguous and ill-defined communication purporting to state that
Whittaker was now the owner of the Trust Assets could not, standing alone, be relied upon as an
accurate reflection of fact."  (Id. at 15.)  This finding is not clearly erroneous, particularly
because Whittaker received a more formal communication after the email contradicting her
purported understanding of the email.  See Facts Stip. Ex. E (account statements directly stating
""[t]he funds in this account belong to your company . . . the existence of the account does not
give you . . . any ownership rights to these or any other assets of the company.")

         Appellant's brief urges an improper standard of review for the Bankruptcy
Court's findings relating to Whittaker's estoppel claim.  Specifically, Appellant claims that
although the Opinion correctly stated the law of equitable estoppel, the Bankruptcy Court
misapplied that law to the facts of Whittaker's claim.  Appellant therefore argues that this Court
should review the Bankruptcy Court's findings *de novo*.  However, the Bankruptcy Court's
findings upon which the estoppel decision was based are purely factual and should therefore be
left intact absent a finding of clear error.  The Bankruptcy Court's ruling on the estoppel claim
relates specifically to the credibility of Whittaker's statement (for example, the Court's
unwillingness to accept her claim that she "honestly didn't think of" including the Trust Assets
on her federal income tax return – see Opinion at 13.)  As noted above, the Federal Rules of
Bankruptcy Procedure require that "due regard shall be given to the opportunity of the

bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013. Giving the required "due regard" to the Bankruptcy Court's Finding that Whittaker's testimony was not plausible, this court should affirm..

**D.    The Deferred Compensation Plan Did Not "Pass Through" the Bankruptcy**

Whittaker argues that, because the Debtors neither assumed nor rejected the Deferred Compensation Plan in the bankruptcy case pursuant to 11 U.S.C. § 365, it passed the bankruptcy unaffected and the Reorganized Debtors must pay deferred compensation in full because they are no longer insolvent. This argument is incorrect on numerous levels and should be rejected.

As a threshold matter, Whittaker did not make this argument to the Bankruptcy Court below and it therefore is waived and cannot be asserted on appeal absent manifest injustice. <u>See Truck Drivers Local 807, etc. v. Carey Transp., Inc.</u>, 816 F.2d 82, 90 (2d Cir. 1987) (refusing to consider an argument in a bankruptcy appeal that was not raised in the courts below); <u>Schmidt v. Polish People's Republic</u>, 742 F.2d 67, 70 (2d Cir. 1984)(noting that "[a] party generally may not raise claims on appeal which it failed to raise before the trial court . . . [a bar which] may be overcome only when necessary to avoid manifest injustice") (internal citations omitted). More fundamentally, the Debtors did move protectively to reject the Deferred Compensation Plan in the bankruptcy case. Whittaker objected to the rejection, arguing that the Deferred Compensation Plan was a non-executory contract not subject to rejection. (Objection to Notice of Rejection at 4-6; Whittaker Designation Exh. 4, Docket No. 10606.) The Debtors agreed with this proposition and withdrew the notice of rejection and Whittaker then nonsensically responded by objecting to the withdrawal, after which the Debtors concluded enough was enough and no further proceedings ensued. (<u>See</u> Notice of Presentment of Order Authorizing Withdrawal of Notice of Rejection; Whittaker Designation Exh. 6, Docket No. 12815; and Whittaker's

Objection and Response to Debtors' Withdrawal of Notice of Rejection; Whittaker Designation

Exh. 7, Docket No. 12904.)  None of this convoluted history matters because the parties agreed

that the Deferred Compensation Plan was non-executory.  The Bankruptcy Court noted simply in

its Opinion that "the Debtors are not rejecting either the Deferral Agreement or the Deferred

Compensation Plan" in response to Whittaker's argument that rejection should not be permitted

because the Debtors had not "set forth a business judgment" for doing so.  (Opinion at 18.)

       The case law Whittaker cites for the proposition that contracts neither assumed nor

rejected pass through the bankruptcy unaffected pertains to *executory* contracts.  See Initial Br. at

32 & n.11.  Monetary obligations of the Debtors under non-executory contracts, in contrast, are

treated as "claims" under the Bankruptcy Code.  11 U.S.C. § 101(5) (2006); In re Manville

Forest Prods. Corp., 225 B.R. 862, 865 (Bankr. S.D.N.Y. 1998) (citing Denton & Anderson Co.

v. Induction Heating Corp., 178 F.2d 841 (2d Cir. 1949) (holding that "[a] claim arising from a

pre-petition, non-executory contract is similar to any other pre-petition claim and would be

discharged by confirmation").  For reasons previously explained, the Deferred Compensation

Plan gives Whittaker no rights other than those of an unsecured creditor.  It is irrelevant that the

Deferred Compensation Plan was neither assumed nor rejected.  Whittaker is barred by the

discharge injunction in the Plan of Reorganization, and by general principles of bankruptcy law,

from asserting any demand against the now-solvent Reorganized Debtors for payment on a

discharged claim.  11 U.S.C. §§ 524(a), 1141(d)(1)(A) (2006).

## **CONCLUSION**

The judgment of the Bankruptcy Court should be affirmed.


Dated:  New York, New York
          July 13, 2007



                                       Respectfully submitted,



                                       Marcia L. Goldstein, Esq. (MS 2606)
                                       Lori R. Fife, Esq. (LF 2839)
                                       Alfredo R. Perez, Esq.
                                       WEIL, GOTSHAL & MANGES LLP
                                       767 Fifth Avenue
                                       New York, NY 10153-0119
                                       Telephone:  (212) 310-8000
                                       Facsimile:  (212) 310-8007

                                             and

                                       /s/ Adam P. Strochak_____
                                       Adam P. Strochak, Esq. (AS 4104)
                                       WEIL, GOTSHAL & MANGES LLP
                                       1300 Eye Street, NW, Suite 900
                                       Washington, D.C. 20005
                                       Telephone:  (202) 682-7000
                                       Facsimile:  (202) 857-0939

                                       *Attorneys for Appellee Verizon Business*
                                       *Global, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of July, 2007 a copy of the foregoing Brief of Appellee Verizon Business Global LLC was sent by electronic mail and FedEx to the parties listed below:

Daniel S. Lubell, Esq.          (lubell@hugheshubbard.com)
Jeffrey S. Margolin, Esq.       (margolin@hugheshubbard.com)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
(212) 237-6000

Counsel for Judith Whittaker

/s/ Abram Medellin