UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDITH WHITTAKER,

                              Appellant,

-v.-

VERIZON BUSINESS GLOBAL LLC, as
successor to Reorganized Debtor, MCI
COMMUNICATIONS CORPORATION,

                              Appellee.

S.D.N.Y. No. 1:07-cv 3408

## REPLY BRIEF OF APPELLANT JUDITH WHITTAKER

### ORAL ARGUMENT REQUESTED

HUGHES HUBBARD & REED LLP
Daniel S. Lubell, Esq.
Jeffrey S. Margolin, Esq.
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

Attorneys for Judith Whittaker

## TABLE OF CONTENTS

<u>Page</u>

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT ..............................................................................................................................2

     I.     Whittaker Owns the Funds in the Putnam Money Market Account.......................2

           A.     The Court Erred As A Matter of Law When It Held That A Distribution From The Rabbi Trust For Tax Purposes Was Not A Distribution For Purposes Of State Property Law. ...........................4

           B.     The Record Demonstrated A Distribution Had Been Made. ......................7

     II.     Verizon Must Be Estopped From Claiming Ownership of the Account Funds. ..................................................................................................10

     III.     Whittaker is Entitled to Payment Under the Unrejected Plan and Trust Agreement. ................................................................................................17

CONCLUSION.........................................................................................................................19

# TABLE OF AUTHORITIES

## CASES

Bank of America, N.A. v. Moglia, 330 F.3d 942 (7th Cir. 2003)......................................................6

718 Arch St. Assocs., Ltd. v. Blatstein (In re Blatstein), 260 B.R. 698 (E.D. Pa. 2001) ..............13

Calucci & Legum v. Murray (In re Murray), 249 B.R. 223 (E.D.N.Y. 2000)...............................10

Daly v. Radulesco (In re Carrozzella & Richardson), 247 B.R. 595 (B.A.P. 2d Cir. 2000) .........10

Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226 (3d Cir. 1997).......................................11

Donovan v. Bierwirth, 680 F.2d 269 (2d Cir. 1982).....................................................................12

Green v. Welsh, 956 F.2d 30 (2d Cir. 1992)..................................................................................17

Herman Miller, Inc. v. Thom Rock Realty Co., 46 F.3d 183 (2d Cir. 1995) ................................13

In re Jet Florida Sys. Inc., 883 F.2d 970 (11th Cir. 1989) ............................................................17

Karavos Compania Naviera S.A. v. Atlantica Export Corp., 588 F.2d 1 (2d Cir. 1978) ..............11

Kronisch v. United States, 150 F.3d 112 (2d Cir. 1998) .................................................................9

Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10 (2d Cir. 2001)....................................................3

Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285 (1892)..................................................................12

Nationwide Check Corp. v. Forest Hills Distribs., Inc., 629 F.2d 214 (1st Cir. 1982) ..................9

Riisna v. Am. Broadcasting Cos., 219 F. Supp. 2d 568 (S.D.N.Y. 2002) ......................................12

Saltzman v. Comm'r, 131 F.3d 87 (2d Cir. 1997)..........................................................................12

Sure-Trip, Inc. v. Westinghouse Eng'g, 47 F.3d 526 (2d Cir. 1995) ...............................................3

United States v. Hamdi, 432 F.3d 115 (2d Cir. 2005) .....................................................................3

Wakefield v. N. Telecom, Inc., 813 F.2d 535 (2d Cir. 1987)..........................................................13

## STATUTES

11 U.S.C. §§ 1141(d), 524(a).........................................................................................................17

11 U.S.C. § 524(e) .........................................................................................................................17

60003173_2.DOC

**MISCELLANEOUS**

Restatement (Second) of Contracts § 202(2) (1981) ......................................................................3

iii

Appellant Judith Whittaker respectfully submits this Reply Brief in further support of her appeal from the Order and underlying Opinion. [1]

## PRELIMINARY STATEMENT

What is striking about Verizon's response ("Response Br.") to the Initial Brief of Judith Whittaker ("Initial Br.") is what it does not address. It does not address the legal authority cited by Whittaker contrary to the Bankruptcy Court's holding that constructive receipt of funds under federal law is not the same as under state law. It does not address the legal authority cited by Whittaker that de novo review should be the proper standard of review to assess the mixed questions of law and fact presented by the equitable estoppel analysis in this case. It completely ignores the legal authority that ownership disputes are governed by the parties' intent and substantive instructions; that those in a position of superior knowledge and trust, with recourse to business records, have a duty to speak to correct their misrepresentations; that adverse inferences are evidentiary requirements as well as punitive sanctions; and that basic rules of construction in the benefits context (as well as outside that context) require interpretation of documents and assumptions to be made in favor of a plan beneficiary and against the drafters of those documents or forfeiture of such benefits.

At one point in its Response Brief, MCI even suggests that this "matter involves no dispute regarding the law governing Whittaker's claims." (Response Br. 2.) This, of course, is wishful thinking about how MCI would like the Court to treat this matter, but it most definitely is not the case. Indeed, the basic facts and documents were stipulated and admitted as

---

1. Capitalized terms not otherwise defined shall have the same meanings as ascribed to such terms in the Initial Brief of Appellant Judith Whittaker (District Court Docket Entry 6).

uncontroverted evidence (Exhs. 1-5) in connection with Whittaker's testimony at the hearing.

Those facts are not really in dispute, even if, on occasion, completely ignored by the Court.  It is

the proper analysis of such facts against the correct legal standards and appropriate rules of

construction which are at issue on appeal.  When this is done, it is clear that Verizon cannot

escape what MCI said and did and did not do.  Exercising its <u>de novo</u> review, this Court should

find that Whittaker is the owner of the Putnam Money Market account and would otherwise be

entitled to receive the funds set aside for payment of her Plan benefits, even if she were not

determined to be the account owner.

<b><u>ARGUMENT</u></b>

**I.     Whittaker Owns the Funds in the Putnam Money Market Account.**

Several points must be kept in mind to avoid the red herrings dangled by Verizon.  First,

Whittaker is not claiming an "ownership interest in the trust assets."  (Response Br. 14; <u>see also</u>

<u>id.</u> at 1, 12-14.)  Rather, Whittaker claims that the fully-funded Money Market account at

Putnam in which her deferred compensation had been invested was her own account.  More than

eight months prior to MCI's bankruptcy, MCI and Putnam had removed the Deferred

Compensation Plan limitations and restrictions under the rabbi trust to Whittaker's receipt of the

funds in this account and had specifically identified her Plan account "as simply an account at

Putnam."  (Fact Stip. ¶¶ 11-12, Exh. D.)  Accordingly, in the first instance, this is a dispute about

ownership of the Putnam Money Market account, not a dispute about a claim by Whittaker under

the Deferred Compensation Plan or against the Trust.

Second, Whittaker was not seeking, as Verizon suggests, a finding "that the Trust was

closed" (Response Br. 15) or that the "Deferred Compensation Plan had been terminated."  (<u>Id.</u>

at 16.)  Whittaker claims instead that her Deferred Compensation Plan benefits had been validly

2

accelerated prior to MCI's bankruptcy, regardless of whether or not the Plan or Trust had been terminated.

In support of her claims, Whittaker agrees with Verizon that "a contract will be interpreted in accordance with its plain and ordinary meaning."  (Id. at 13 (citations omitted).)  That canon of construction, however, applies to all of the provisions of the contract, which must be read as a whole to give meaning to all of its parts.[2]

Verizon attempts to focus the Court's attention on certain undisputed provisions of the Plan and Trust Agreement as if MCI's directions to remove the restrictions to Whittaker's receipt of her Plan benefits had not been given.  (See Response Br. 12-14.)  In doing so, Verizon avoids the plain and ordinary meaning of Section 12.07 of the Deferred Compensation Plan, which must be given effect.  MCI was authorized "to accelerate the payment of any benefits payable under this Plan at any time without the consent of the Participant, the Participant's estate, a Beneficiary or any other person claiming through the Participant."  (Fact Stip. ¶ 4, Exh. B, § 12.07.)  MCI exercised that authority by directing Putnam that the restrictions to Whittaker's receipt of her Plan account funds "no longer exist" and that her account is to be treated "simply as an account at Putnam."  (Id. at ¶¶ 11-12, Exh. D.)

A plain and ordinary meaning must also be given to Section 5.4(d) of the Trust Agreement authorizing Putnam "[t]o make payments from the Trust to such person, in such manner, at such time and in such amounts as MCI shall direct, without inquiring as to whether payee is entitled to payment or as to whether the payment is proper, to the extent such payment is

---

2.    See United States v. Hamdi, 432 F.3d 115, 123 (2d Cir. 2005) ("We begin with the basic contract law principle that contracts are to be interpreted as a whole . . . ."); Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 17 (2d Cir. 2001) ("A writing is interpreted as a whole."); Sure-Trip, Inc. v. Westinghouse Eng'g, 47 F.3d 526, 533 (2d Cir. 1995) ("[T]he intention of the parties is not derived from sentences or clauses read in isolation, but from the instrument as a whole."); Restatement (Second) of Contracts § 202(2) (1981) ("A writing is interpreted as a whole. . . .").

60003173_2.DOC

made in good faith, without actual notice or knowledge of the impropriety of such payment."
(Id. at ¶¶ 6-7, Exh. C, § 5.4(d) (emphasis added).)

Perhaps most telling in the Court's failure to give these provisions their plain and
ordinary meaning is that the Court omitted the highlighted portion of the Trust Agreement
language — "in such manner" — when it quoted this provision in its Opinion (at 8).  The
Bankruptcy Court instead read into the Plan and Trust Agreement provisions that are not found
in those agreements, stating that the trust assets had to be transferred "from one Putnam account
to another" for there to be a distribution under state law.  (Opinion 10.)  The Court further held,
"as a matter of law," that the removal of the Deferred Compensation Plan restrictions and
Whittaker's receipt of a distribution of trust funds for federal tax purposes did not vest her with
ownership of the funds for state property law purposes.  (Id. at 9.)  In doing so, the Bankruptcy
Court ignored that constructive receipt of the trust assets for federal tax purposes was sufficient
for constructive receipt of trust assets for state property law purposes.  While Verizon attempts to
distance the Court from its unsupported holding (Response Br. 2, 18), this case involves
principally the legal effects of an accelerated payment of benefits under the Plan.

**A.    The Court Erred As A Matter of Law When It Held
That A Distribution From The Rabbi Trust For Tax Purposes
<u>Was Not A Distribution For Purposes Of State Property Law</u>.**

Verizon contends that "[a]t best, the November 20th [Putnam] email could be read to
suggest that MCI would have consented to early termination of Whittaker's deferral period if she
had submitted a written request that it do so."  (Response Br. 15.)  However, this interpretation is
not how the Bankruptcy Court read the Putnam Email, nor is it consistent with how acceleration
works under the Plan, nor how the Putnam Email should be interpreted employing ordinary
canons of construction.

4

First, rather than suggesting that MCI might consent to an early termination of Whittaker's deferral period, the Court stated that the plain language of the Email — "[T]his is viewed simply as an account with Putnam," etc .— may be read "that the Trust Assets had been distributed." (Opinion 10.)  This interpretation is consistent with Section 12.07 of the Plan that removal of the deferral period "accelerate[s] the payment of benefits," which is made "without the consent of the Participant."  It is also consistent with the context of the Putnam Email and Whittaker's contemporaneous notes of her conversation with Hutchins.  Thus, in response to Whittaker's "cash out" inquiry (Exh. 4), MCI and Putnam stated that "as far as removing funds from this account," they were aware that under the "original documents" (Whittaker's Deferral Agreement), she had irrevocably elected to defer receipt of her compensation "until 2003," but stated that this "waiting period no longer exists" and "that the funds in the current account are available to you to take whenever you choose to take them."  (Exh. D.)  In so stating, MCI and Putnam were not conditioning termination of the deferral period upon some future request, as Verizon contends.  Instead, they unambiguously acknowledged that an accelerated payment had occurred and that the "substantial limitation and restrictions" to Whittaker's receipt of her deferred compensation had been removed.  Indeed, if there were any ambiguity as to this interpretation, as Whittaker's Initial Brief demonstrated and as is not contested by Verizon, that ambiguity must be construed against the drafters of the Putnam Email (MCI and Putnam) and in favor of Whittaker as the beneficiary under a benefits plan.  (Initial Br. 27 n.8, 31 n.10 (citing cases).)

As further demonstrated in Whittaker's Initial Brief (at 15-19) and as acknowledged by MCI's own benefits accountant Helms (Helms Depo. 9, 88), acceleration of benefits payable under the Plan was legally sufficient to establish that the Trust assets were distributed to

5

Whittaker.  The law governing rabbi trusts makes clear that it is the removal of the "substantial limitations" that constitutes a distribution from the Trust under the federal tax law.  (Initial Br. 16, citing Bank of America, N.A. v. Moglia, 330 F.3d 942, 944 (7th Cir. 2003).)  In addition, the law is also clear that a requirement to give notice to receive those funds (such as the signed and notarized letter of instruction contemplated by the Putnam Email) does not constitute a "substantial limitation or restriction" for distribution purposes.  (Initial Br. 16-17.)

While Verizon parrots the Bankruptcy Court's holding that "constructive receipt" of funds from a rabbi trust for tax purposes does not equate to "actual ownership or possession for purposes of state property law" (Response Br. 18, quoting Opinion 9), like the Bankruptcy Court, Verizon offers no legal support for this erroneous proposition.  As the long line of both state law and bankruptcy cases cited by Whittaker attests and as Verizon does not contest, constructive receipt equates to "dominion and control" for purposes of state property law.  (Initial Br. 17-18.)  Thus by making the funds in Whittaker's Plan account "available to you whenever you choose to take them" and setting apart her account as "simply an account at Putnam," MCI did more than effectuate a distribution for federal tax purposes.  It expressly changed Whittaker's status vis a vis the fully-funded Putnam account under state property law from that of a creditor of MCI with an unsecured promise to pay benefits to a vested owner of the funds standing credited to her account.  (Id. at 17-19.)

Contrary to Verizon and the Bankruptcy Court (Response Br. 19), removing the "substantial limitations" to Whittaker's receipt of the funds by treating the account as simply an account at Putnam, rather than as an unsecured claim by Whittaker against the rabbi trust, was alone sufficient to establish that a distribution had been made.  The issue of ownership under federal law as well as under state law was not whether Whittaker physically removed the funds

6

out of the account, but whether she was granted dominion and control over her account funds to be in constructive receipt of the funds therein.  As the Putnam Email evidences, and as is supported by a litany of surrounding facts ignored by the Bankruptcy Court, that is what in fact transpired prior to MCI's bankruptcy.

       **B.**      <u>**The Record Demonstrated A Distribution Had Been Made**</u>**.**

Had the Bankruptcy Court properly applied the law that removal of the "substantial limitations" to Whittaker's access to the funds in the Putnam account constituted a distribution of the trust assets for purposes of both federal and state law, then the record is clear that a distribution had in fact been made.  The Putnam Email is plain that MCI had accelerated payment by removing the waiting period under Whittaker's Deferral Agreement and directing the treatment of Whittaker's account as a Putnam, rather than a Plan, account.  (Exh. D.) Whittaker's contemporaneous handwritten notes of her conversation with Hutchins reflects that Whittaker was requesting a "cash out" of her Plan account.  (Exh. 4.)  The Putnam Email confirms this case by stating, "as far as removing the funds from this account . . . ."  Indeed, it was stipulated that "Blackman provided MCI's response" to Hutchins' request for "<u>directions from MCI in response to Whittaker's inquiry</u>."  (Fact Stip. ¶¶ 11-12.)

Helms also testified that he received the Putnam Email containing MCI's directions, understood that it provided Whittaker unqualified access to the funds in the account; assumed Hutchins had received authority from Blackman to accelerate payment; and did nothing to contradict the directions given in the Putnam Email.  (Helms Depo. 78-91.)  The records introduced by Whittaker (Exhs. 1 and 2) and testimony of Helms (Helms Depo. 52-53, 96) also demonstrated that Whittaker's Plan account at Putnam was fully-funded and identifiable from other assets in the Trust so as to be available to her after acceleration "as simply an account at Putnam."

7

It was stipulated that the Putnam Email was kept as a business record by both Putnam and MCI (Fact Stip. ¶ 12), reflecting the acceleration and parties' intent that Whittaker's account be treated as her own account at Putnam.  It is the only business record produced by Putnam concerning Whittaker's account during the relevant period prior to MCI's bankruptcy filing, reflecting no contrary intent by any party.  Moreover, the directions that the "waiting period no longer exists" and that Whittaker's account would be treated "as simply an account at Putnam" were not contradicted by any contemporaneous record produced by MCI.  As the relevant case law makes clear and as Verizon again does not contest, it is the substantive instructions and parties' intentions concerning the treatment of an account which governs an ownership dispute, not the title of the account.  (Initial Br. 22-23.)

Moreover, MCI acknowledges that Blackman maintained the records regarding the administration of Whittaker's account and stipulated that it could not locate those records.  (Fact Stip. ¶¶ 11-12.)[3]  MCI also admitted that it had reviewed "their books and records and determined that there is no record of a debt owed" to Whittaker (Exh. H), reflecting that Whittaker's Plan benefits had in fact been accelerated and paid.  Verizon argues without legal support, that an adverse inference should not be drawn from these admissions and lack of records, because an adverse inference is a sanction, which was waived in this case.[4]  (Response Br. 18.)  However, an adverse inference is not limited to a punitive rationale, but has evidentiary and remedial rationales as well, which are nothing more in this case than the common sense observation that a party who is responsible for maintaining relevant Plan records, which it cannot

---

3.  Helms had to resurrect the Plan records without Blackman's correspondence and files after the bankruptcy and admitted they may well be mistaken.  (Helms Depo. 92-96.)

4.  Whittaker had sought sanctions with respect to MCI's failure to produce any records in response to two properly served document requests, not as to MCI's failure to maintain Blackman's records.  (See Motion to Compel (D.E. 12904).)  MCI's failure to maintain Blackman's records was stipulated by MCI, after the Motion to Compel was filed.

locate, cannot place the burden upon the party prejudiced by the failure to maintain such records to produce them.[5]    Indeed, leaving aside the word "adverse," the only inference that can be fairly drawn by the absence of any records contradicting the accelerated payment of Whittaker's account and the admission of no record of a debt owed to Whittaker by MCI is that the missing records maintained by Blackman were consistent with his directions in the Putnam Email.

The evidence Verizon identifies in support of the Court's finding that a distribution had not been made does not change the legal effect of accelerating payment of Whittaker's Plan benefits.  (Response Br. 16.)  Thus, Helms' testimony that the Plan and Trust were not terminated does not change the status of Whittaker's Money Market Account at Putnam after acceleration of payment of Whittaker's Plan benefits.  Nor does fine print, boilerplate on the last page of an unidentified and unread account statement change MCI's specific direction to Putnam and the parties' intent that the Plan account be treated "simply as an account at Putnam," that the "waiting period" under the Deferral Agreement "no longer exists" and that the account funds are available to Whittaker "whenever [she] chooses to take them."  Like the treatment of an incorrect title on an account, the parties' substantive instructions and intent takes precedence over boilerplate in an incorrect form.  (Initial Br. 22-23 (citing cases).)

Whittaker submits that the Bankruptcy Court came to a clearly erroneous factual determination that "Whittaker has not identified any documents recording such a transfer" because it applied an incorrect legal standard and therefore ignored the litany of evidence

---

5.    See, e.g., Kronisch v. United States, 150 F.3d 112, 127 (2d Cir. 1998) ("This adverse inference rule is supported by evidentiary, prophylactic, punitive, and remedial rationales"); Nationwide Check Corp. v. Forest Hills Distribs., Inc., 629 F.2d 214, 218 (1st Cir. 1982) ("the adverse interest is based on two rationales, one evidentiary and one not.").

9

introduced by Whittaker.[6]  Thus, contrary to the Bankruptcy Court's legal conclusions,

Whittaker did not have to demonstrate that "the Trust Assets had been transferred out of the

Trust to either a general Putnam account or an account specifically created for and belonging to

Whittaker."  (Opinion 10.)  Under the governing law regarding distributions from a rabbi trust

and the terms of the Plan and Trust Agreement, it was sufficient for Whittaker to establish that

the limitations to Whittaker's receipt of the funds in her Plan account had been removed and that

this fully-funded, identifiable account had been set apart by MCI and Putnam as "simply an

account at Putnam."  It was thus sufficient for Whittaker's claim of ownership to demonstrate

that she had constructively received her account funds, even if the funds were not physically

removed from one account to another or actually withdrawn.  Based upon the law regarding

removal of the substantial distributions under a rabbi trust and constructive receipt of funds, the

parties' intent and directions, and the other supporting evidence such as the admission of no debt

owed by MCI to Whittaker, this Court should find that Whittaker was the owner of the Putnam

Money Market account at the time of MCI's bankruptcy filing.

## II.    Verizon Must Be Estopped From Claiming Ownership of the Account Funds.

If Whittaker had to remove the funds from her Plan Money Market account to receive a

distribution from the Trust, then Putnam and MCI should have informed her:

> As far as removing funds from your Plan account, the waiting
> period under your Deferral Agreement no longer exits.  However,
> the funds continue to be held in a Trust in which you have no
> beneficial ownership.  All you hold is MCI's unsecured promise to
> pay you under the Plan.  You may send a signed and notarized
> letter of instruction to remove the funds, but you must withdraw

---

6.  See Calucci & Legum v. Murray (In re Murray), 249 B.R. 223 (E.D.N.Y. 2000) (Decision of Bankruptcy Court clearly erroneous where Court applied incorrect standard for materiality); Daly v. Radulesco (In re Carrozzella & Richardson), 247 B.R. 595, 604 (B.A.P. 2d Cir. 2000) (Bankruptcy Court clearly erroneous in applying wrong legal standard when it held that defendants, as beneficiaries of a trust fund, did not have to trace their funds in order to maintain their priority over the debtor's other unsecured creditors).

10

> them from the account to have access to them whenever you
> choose.  Otherwise, if you keep your account as is, you will have
> no ownership interest in the funds.

Instead, MCI and Putnam, knowing that Whittaker would be relying upon their response to her "cash out" request, mislead her with the statements that "as far as removing the funds from this [Plan] account," "the waiting period no longer exists."  This account is now "viewed as simply an account at Putnam.  What this means is that the funds in the current account are available to you whenever you choose to take them."  "[Y]ou are able to keep your account as is."  (Exh. D (emphasis added).)

After receiving the Putnam Email in response to her "cash out" request, Whittaker left her account funds alone because, as Whittaker testified, she believed "I just had an account at Putnam I could move at any time."  (Hearing Tr. 20.)  Whittaker submits that the Bankruptcy Court erred when it declined to estop Verizon from now pursuing its claim of ownership over that account because it found that Whittaker had not reasonably relied upon the statements in the Putnam Email.

Contrary to Verizon's unsupported contentions (Response Br. 21), the application of the doctrine of equitable estoppel presents mixed questions of law and fact which should be reviewed de novo.  Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 236 (3d Cir. 1997) (determination of an equitable estoppel claim is a mixed question of law and fact subject to "plenary review"); Karavos Compania Naviera S.A. v. Atlantica Export Corp., 588 F.2d 1, 9 (2d Cir. 1978) (estoppel is a mixed question of fact and law subject to "plenary review").  This is particularly true in this case where the Bankruptcy Court ignored MCI's and Putnam's legal duty to correct their misstatements; failed to assign to the Putnam Email the proper construction and legal significance that the law requires; and made various assumptions about reliance which reflect the mixed questions of law and fact implicit in the equitable estoppel analysis.

11

As Verizon points out (Response Br. 21, citing Opinion 13), the Bankruptcy Court made an assumption that it was equally plausible that Whittaker did not withdraw the funds after receiving the Putnam Email because she intended to maintain the funds in the Plan account rather than withdraw them from the Plan account. This assumption, however, is contrary to the general assumption that one intends to do what one requests to do – that when Whittaker made her "cash out" request, she intended to cash out.[7]

Moreover, it completely ignored or dismissed as unreasonable Whittaker's uncontroverted testimony that the Putnam Email, with its statement that the funds "are available to you to take whenever you choose," induced her not to send a letter immediately requesting a withdrawal. (Hearing Tr. 14-20.)

The Bankruptcy Court's assumption also ignored entirely that MCI, as Plan proponent, and Putman, as Plan trustee, with access to the records and superior knowledge, had a legal duty to correct their miscommunications about withdrawal of funds from the Plan and, further, that decisions regarding benefit plans are to be made "with an eye single to the participants and beneficiaries." Donovan v. Bierwirth, 680 F.2d 269, 271 (2d Cir. 1982); see Initial Br. 27. Accordingly, if it was equally plausible for Whittaker as the Plan beneficiary to have relied upon the Putnam Email, then as a legal matter the assumption should have been made in favor of the Plan beneficiary and against the Plan proponent and Plan Trustee who had the duty to correct their misstatements.

---

7. See, e.g., Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 295 (1892) ("[W]henever the intention is of itself a distinct and material fact in a chain of circumstances, it may be proved by contemporaneous oral or written declarations of the party."); Saltzman v. Comm'r, 131 F.3d 87, 94 (2d Cir. 1997) ("[a] declarant's out-of-court statement of intent may be introduced to prove that the declarant acted in accordance with that intent."); Riisna v. Am. Broadcasting Cos., 219 F. Supp.2d 568, 574 (S.D.N.Y. 2002) ("[S]tatements of intention to do an act are admissible to prove the later performance of the act . . . .").

In addition to finding a lack of reliance by ignoring Whittaker's testimony and employing a misguided assumption in favor of Verizon, the Bankruptcy Court further found, as Verizon notes, that Whittaker had not identified any affirmative action taken in reliance on the Putnam Email.  (Response Br. 20-21, citing Opinion 14.)  However, here again the Bankruptcy Court and Verizon completely ignored that Whittaker had taken affirmative action based upon the Putnam Email.  As stipulated, Whittaker "without notification" that the Putnam account had been frozen had requested "a check in the amount of the balance in her account at Putnam" before the end of her deferral period.  (Fact Stip. ¶¶ 11, 16-17.)  Furthermore, as reflected in Hutchins' email to Helms (id. at ¶ 19, Exh. G.), Whittaker had specifically referred to the Putnam Email as the basis for her statements to Hutchins, after she affirmatively sought to remove her funds and found out her account had been frozen, "that her account was [to be] treated as a regular investing account, without MCI control."  Ignoring evidence as the Bankruptcy Court did here is grounds for reversal even under a clearly erroneous standard, no less under the de novo review applicable to this issue.[8]

To support the Court's assumption that Whittaker did not rely upon the Email, Verizon contends that "there is evidence in the record suggesting that Whittaker may have been concerned about the possibility of a forced distribution and elected to leave her account 'as is' to continue the deferral of the obligation to pay income taxes on the value of the account." (Response Br. 21, citing Hutchins Depo. 105-107.)  However, Hutchins not only specifically testified that Whittaker did not articulate any concern about incurring tax liabilities on account of

_____

[8]   See, e.g., Herman Miller, Inc. v. Thom Rock Realty Co., 46 F.3d 183, 189 (2d Cir. 1995) (damage award reversed and remanded because district court disregarded certain testimony); Wakefield v. N. Telecom, Inc., 813 F.2d 535, 540 (2d Cir. 1987) (summary judgment was improper because district court "unfairly" ignored evidence); 718 Arch St. Assocs., Ltd. v. Blatstein (In re Blatstein), 260 B.R. 698, 717 (E.D. Pa. 2001)  (Bankruptcy Court erred "by ignoring the considerable evidence in the record that Lori clearly had the right to put the transferred funds to her own purpose.  As a result, even under the high standard employed by the bankruptcy court, Lori had dominion and control. . . ." (emphasis omitted)).

any forced distribution in their conversation, but, as far as taxes were concerned, they "didn't discuss that at all." (Hutchins Depo. 107.)[9]

The only other contention cited by Verizon in support of the Bankruptcy Court's ruling is that Whittaker did not rely upon the Putnam Email because she did not include her constructive receipt of her deferred compensation in her income tax return. (Response Br. 21.) While true, the rarified concept of constructive receipt of income should not have had any bearing on a decision made seven months earlier based upon MCI's misleading response to her inquiry about removing funds from her account, nor about her continued reliance on those statements, particularly when Whittaker did not receive any 1099 tax form or any other documentation providing notice of her deferred compensation income. (Fact Stip. ¶ 15.)

In the context of a <u>de novo</u> review (or even under a clearly erroneous standard), this Court should find that it simply is not "implausible," as the Bankruptcy Court and Verizon suggest, to believe based upon information provided by the Plan Trustee that funds in an account are available to you at any time, yet inadvertently forget (or even know) to pay taxes when you do not receive a tax statement and have never paid taxes with respect to those funds before.

This Court should properly return its focus back seven months when decisions were made in response to the Putnam Email in the context of Whittaker's "cash out" request and find, based upon a proper review of (i) Whittaker's testimony, (ii) the corroborating contemporaneous evidence as well as (iii) the application of the correct assumptions in the Plan beneficiary/Plan proponent "cash out" request context, that, of course, Whittaker relied upon Putnam's and MCI's

---

9.  Hutchins conceded that she did not understand the concept of "accelerating payments" (i.e., forced distribution) as well as other aspects of the Plan as the Plan was not her responsibility. (Hutchins Depo. 20, 32-33, 36-37, 45-47.) As reflected by the failures to send account statements, retain files, correct Blackman's directions if they were truly incorrect, or change the account title to conform to MCI's directions, no one other than Blackman seemed to take responsibility for the Plan prior to MCI's bankruptcy filing. Indeed, Helms testified that he wasn't even aware of the rabbi trust until after MCI's bankruptcy, by which time Blackman had left MCI and Helms had to resurrect the Plan documents without Blackman's "correspondence and files." (<u>Id.</u> at 92-94.)

14

statements that "the funds in the current account are available to you whenever you choose to take them."  Indeed, the Putnam Email essentially deprived Whittaker of any urgency to do otherwise with the funds in the account until she actually needed to access them.[10]

Finally, this Court should find that Whittaker's reliance upon a written response by the Trustee through Hutchins, the individual to whom Helms had referred her (Fact Stip. ¶ 11), with a "cc" to MCI through Helms, an individual Whittaker had worked with when she had been on the MCI Compensation Committee, was reasonable.  Verizon simply ignores the cases cited by Whittaker that emails have the same legal force as other writings and that Putnam and MCI, as the parties with the records and superior knowledge concerning Whittaker's Plan account, had a legal duty to correct any inaccuracies in their written communication.  (Initial Br. 22.)

Like the Court, Verizon also cites no authority for the untrue proposition that Whittaker, as a former director of MCI prior to its merger with Worldcom three years earlier (Fact Stip. ¶ 8) or as a corporate lawyer, would have reason to know the answers to her own "cash out" request inquiry or had some heightened duty to investigate the Trustee's emailed response to this inquiry, particularly when she had reason to trust the source of the information.  Verizon and the Court again simply ignored the evidence that the Email response conformed to Whittaker's prior course of dealings by email about her Plan account (see Exhs. 1 and 2), conformed to the context of the "cash out" request made a week earlier, and conformed with Whittaker's failure to receive account statements and other surrounding facts that the Plan was no longer operative.  (See Initial Br. 27.)

---

10.  As Whittaker testified (Hearing Tr. 12-17), and as corroborated in the Putnam Email (Exh. D), Whittaker's notes of several telephone calls with Putnam and MCI (Exhs. 3,4), and the testimony of Hutchins (Hutchins Depo.  68, 85-87) and Helms (Helms Depo. 74-75), Whittaker made her "cash out" request because she was not getting statements or information about her Plan account, as opposed to any urgent need to access her account funds.  Even after the Putnam Email gave her access to her account at anytime, it was again Whittaker's failure to receive account statements that caused her to request a check for the balance of her account, which is when she found out that her account had been frozen.  (Fact Stip. ¶¶ 14, 17; Hearing Tr. 23-24.)

Indeed, Verizon and the Court ignored that Helms, MCI's benefits accountant, understood the Putnam Email in the same manner as Whittaker but said nothing to contradict the directions given by Blackman, which were recorded "verbatim" in the Putnam Email.  Verizon's attempt to shift the burden upon Whittaker to further investigate the specific response made by the parties actually administering the Plan, based upon an unreceived tax statement and unread, fine-print boilerplate on page 4 of a single statement received at some unidentified time after her receipt of the Putnam Email, but before MCI's bankruptcy, is itself unreasonable.  It again ignores the legal canons that specific instructions and substantive directions take precedence over general boilerplate and the legal duty to affirmatively speak by those in positions of trust with superior knowledge.

Finally, Verizon argues "that the Bankruptcy Court's ruling on the estoppel claim relates specifically to the credibility of Whittaker's statement[s]."  (Response Br. 22.)  However, this is hardly true.  The Bankruptcy Court's ruling on the estoppel claim relates to the Bankruptcy Court's errors of not according an email from the Plan Trustee its plain meaning and legal significance, placing upon a Plan beneficiary knowledge and legal obligations of those of the Plan proponent and Plan Trustee, ignoring evidence of affirmative reliance and making quasi-legal assumptions that are at odds with the circumstances at the time and generally accepted principles of interpretation.  While this would clearly constitute sufficient grounds to reverse under a clearly erroneous standard, this Court should properly review the Bankruptcy Court's rulings encompassing mixed questions of law and fact de novo and find that it was perfectly reasonable for Whittaker to rely upon the express statements:  "[T]his is viewed as simply an account with Putnam.  What this means is that the funds in the current account are available to you whenever you chose to take them.  That waiting period no longer exists."  (Fact Stip. Exh.

D.) She should not have first learned when she went to withdraw her savings that they were not available; Putnam and MCI had misled her.

**III.**     <u>**Whittaker is Entitled to Payment Under the Unrejected Plan and Trust Agreement**</u>.

Contrary to Verizon's contentions (Response Br. 23.), Whittaker did in fact make the argument below that "the plan itself provided for the resumption of benefits when the Company is 'no longer Insolvent,'" explaining the "Debtors have emerged from bankruptcy, are no longer insolvent, and do not need to confiscate Ms. Whittaker's retirement benefits to fund their plan obligations," and referring to Sections 3.2(d) and 3.3 of the Trust Agreement. (Judith Whittaker's Pre-Hearing Memorandum (D.E. 18331 at 22-23).)[11]

Whittaker agrees with Verizon that Bankruptcy Code Sections 1141(d) and 524(a) operate as a discharge and injunction against any debt MCI owed Whittaker arising before confirmation of its Plan of Reorganization on October 31, 2003. 11 U.S.C. §§ 1141(d), 524(a). However, Verizon misapprehends Whittaker's rights. (Response Br. 24.) Section 524(e) provides that this injunction "does not affect the liability of any other party on . . . such debt." 11 U.S.C. § 524(e). This language "reveals that Congress sought to free the debtor of his personal obligations" while at the same time "ensuring no one else reaps a similar benefit." <u>Green v. Welsh</u>, 956 F.2d 30, 33 (2d Cir. 1992) (creditor did not have to seek modification of permanent injunction to proceed against former debtor's liability insurer); <u>In re Jet Florida Sys. Inc.</u>, 883 F.2d 970 (11th Cir. 1989) (same).

If the Court finds that Whittaker is not the owner of the Putnam Money market account, it should find that Whittaker continues to have rights under the unrejected Plan and Trust, in which

---

11. The tortured procedural history of MCI's Notice of Rejection, Withdrawal of Notice of Rejection and withdrawal of the Withdrawal, arose as a result of MCI's procedural machinations. Moreover, contrary to Verizon's statement that "the parties agreed that the Deferred Compensation Plan was non-executory" (Response Br. 24), the parties stipulated that they continued to dispute the status of the Deferred Compensation Plan as an executory contract. (Fact. Stip. Exh. 5, Whereas Cl. 17.)

she is the sole remaining beneficiary.  According to the Plan, Whittaker "shall have a **nonfortfeitable** right to the value of the Participant's Account attributable to Deferred Compensation plus deemed return under the terms of this Plan."  (Fact Stip. Ex. B § 6.02.)  This "nonfortfeitable right" remains a right with respect to the Trust regardless of the discharge of any claim Whittaker may have had against MCI personally under the Plan or whether or not the Plan and Trust are executory or non-executory contracts.  That right is protected under the Trust Agreement against any encroachment by Verizon:  "MCI shall have no right or power to direct Trustee to return to MCI . . . any of the Trust assets before all payment of benefits have been made to Plan participants . . ." which payments may resume in this case because Verizon is solvent.  (Id. at Exh. C § 4.1.)  Moreover, neither Verizon nor the Trustee may revoke the Trust, or terminate it until Plan participants and their beneficiaries are "no longer entitled to benefits pursuant to the terms of the Plan" without the "written approval of participants or beneficiaries entitled to benefits pursuant to the terms of the Plan."  (Id. at §§ 11.1, 11.2, 11.3.)

    As the Plan has passed through the bankruptcy and Verizon is concededly not insolvent (Response Br. 24), the Court should direct that Whittaker's nonforfeitable right to payment from the Trust be honored.  (See Fact Stip. Exh. C § 3.2(d) ("Trustee shall resume the payment of benefits to Plan participants or their beneficiaries…after Trustee has determined that MCI is not insolvent"); § 3.3 (formula for resuming payments under Trust).)

    While Verizon claims that "the Reorganized Debtors take no pleasure in denying payment to Whittaker of the money she earned in serving as a member of the MCI Board of Directors" (Response Br. 3), this is the result they seek to improperly achieve as Verizon is concededly not insolvent, has no right to interfere with distributions under the Trust and the

Trust funds are properly available for payment to Whittaker on account of her nonforfeitable rights.

## CONCLUSION

For the reasons stated herein, this Court should reverse and find that the funds in the Putnam Money Market account are Whittaker's property.  Alternatively, this Court should hold that Verizon, as successor to MCI, is estopped from denying that the Putnam Money Market Account is Whittaker's property.  Alternatively, it should find that Whittaker continues to be entitled to payment from the Trust of her Plan benefits under the unrejected Plan and Trust Agreement.  This Court should also grant Whittaker such other and further relief as the Court deems just, including awarding her accrued interest, pre-judgment and post-judgment interest, attorneys' fees and costs.

Dated:  August 10, 2007

Respectfully submitted,

HUGHES HUBBARD & REED LLP

By: /s/ Daniel S. Lubell_____
    Daniel S. Lubell, Esq.
    One Battery Park Plaza
    New York, New York 10004-1482
    (212) 837-6000

Counsel for Judith Whittaker

19